In the

# United States Court of Appeals

## For the Seventh Circuit

No. 07-2404

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

MARTIN AVILA,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Southern District of Indiana, Indianapolis Division.
No. 02 CR 141—**David F. Hamilton**, *Chief Judge.*

ARGUED OCTOBER 29, 2008—DECIDED MARCH 6, 2009

Before POSNER, MANION, and KANNE, *Circuit Judges*.

KANNE, *Circuit Judge.* From 2000 to 2001, law enforcement officers conducted an investigation that revealed extensive drug trafficking activities in the Indianapolis area. An organization comprised primarily of Mexican nationals was obtaining large amounts of controlled substances from individuals in Mexico, Texas, and Illinois, and redistributing the drugs throughout parts of Indiana. On October 17, 2002, defendant Martin Avila and eight other individuals were indicted for their roles in the

conspiracy. Avila was tried alone in a two-day jury trial and convicted on March 13, 2007. He was sentenced to 396 months' imprisonment and ten years of supervised release. Avila appeals his conviction and sentence. He argues (1) that he was prejudiced by a fatal variance between the charged crime and the proof adduced at trial; (2) that the district court erred in admitting several witnesses' testimony or comments; and (3) that the Sentencing Guidelines range imposed was inaccurate. For the reasons that follow, we affirm Avila's conviction and remand for resentencing.

## I. BACKGROUND

In mid-2000, the Federal Bureau of Investigation, Immigration and Naturalization Services,[1] Indianapolis Police Department, and Metropolitan Drug Task Force began investigating the drug trafficking activities of a Mexican drug organization. Law enforcement determined that members of this organization were obtaining large amounts of controlled substances, including methamphetamine, cocaine, marijuana, and amphetamine, from individuals in Mexico, Texas, and Illinois. They were then distributing the drugs throughout areas in Indiana surrounding Indianapolis. Martin Avila, Fidelmar Soto-Nava, Wilbert Avant, Rene Nava-Rubio, and Hilario Espinoza-Sarco were all identified as potential members of the organization.

---

[1] This agency has been known since 2003 as the Bureau of Immigration and Customs Enforcement. It was known as the INS at the time of this investigation.

From March through August of 2001, officers utilized court-authorized wiretaps to monitor cellular telephones linked to Soto-Nava and Nava-Rubio. In several of the intercepted conversations, Avila discussed the sale of drugs with Nava-Rubio using code language. At times, Avila also spoke briefly with Soto-Nava, although it does not appear from the record that they discussed drug distribution. Seventeen of these recordings would later be admitted into evidence at Avila's trial.

On October 17, 2002, Avila and eight other members of the organization were indicted for conspiracy to distribute and/or possess with the intent to distribute numerous controlled substances. Specifically, the grand jury charged that Avila and his co-conspirators distributed 500 grams or more of a mixture or substance containing methamphetamine, 50 grams or more of methamphetamine, 500 grams or more of a mixture or substance containing a detectable amount of cocaine, and 100 kilograms or more of a mixture or substance containing a detectable amount of marijuana.

Avila's jury trial began on March 12, 2007. In his opening statement, Avila's counsel claimed that this was a case of mistaken identity. He conceded that there was significant evidence of a conspiracy, but he argued that Avila had never had contact with Nava-Rubio and that he had no role in the alleged conspiracy.

In its case-in-chief, the government called two law enforcement officers who had been involved in the investigation, Jo Ann Burkhart and Michael Reeves. Burkhart, an FBI special agent in Indianapolis, testified

that law enforcement personnel had discovered the drug operation and eventually seized large quantities of meth-amphetamine, marijuana, cocaine, and amphetamine. She also explained the monitoring of Soto-Nava's and Nava-Rubio's phones.

Reeves, an INS agent at the time of the investigation, testified that he was working undercover in Indianapolis in 2001. While undercover, Reeves purchased metham-phetamine from Soto-Nava at least twice, once on a consignment basis. He also testified that after Soto-Nava was incarcerated, he continued to purchase drugs from Soto-Nava's common-law wife and another young man.

The government also called two of Avila's co-defen-dants—Avant and Nava-Rubio. Avant testified that he was selling drugs in Indianapolis in 2000 and 2001. Avant originally had been receiving drugs from Soto-Nava and Nava-Rubio. At some point, however, Soto-Nava intro-duced Avant to Avila so that Avant could obtain larger quantities of cocaine. Avant never testified to whether Avila knew that this was the purpose of the introduction.

Avant testified that in 2000 and 2001, Avila supplied him with approximately 3 to 4 pounds of methamphet-amine and 5 to 6 kilograms of cocaine per month, as well as a total of 500 pounds of marijuana. Avila sold these drugs to Avant on a consignment basis. Avila would deliver the drugs himself or have someone else deliver them, often using hidden compartments in automobiles to conceal the drugs.

Nava-Rubio testified that Avila, who was living in Chicago, asked Nava-Rubio to sell drugs for him in

Indiana and provided him with the drugs on consignment. Avila or someone working for him—such as Hilario Espinoza-Sarco—would transport the drugs to Indiana using hidden compartments. Over the course of their relationship, Avila supplied Nava-Rubio with over 100 pounds of methamphetamine, 20 to 30 kilograms of cocaine, and 300 to 400 pounds of marijuana.

The government also used Nava-Rubio's testimony to authenticate and explain sixteen of the intercepted telephone calls between Avila and Nava-Rubio that were introduced into evidence and played for the jury. In one of the telephone calls, Avila and Nava-Rubio discussed using a hidden compartment in Avila's car to transport drugs. In other calls, Nava-Rubio and Avila discussed payments for drugs that Avila had fronted to Nava-Rubio. Nava-Rubio and Avila also discussed Nava-Rubio selling the drugs Avila had provided him to a "white guy."

As its final witness, the government called Sergeant Dean Wildauer. Wildauer, a member of the Indiana State Police criminal interdiction team, testified to the typical use of hidden compartments in drug trafficking operations.

Avila opted not to testify or present any evidence. He never made a motion for a judgment of acquittal, and the jury found him guilty on March 13, 2007.

The presentence report (PSR) was provided to the parties on May 4, 2007. The PSR indicated that the total marijuana equivalency weight of the drugs distributed was 24,234 kilograms and recommended a Base Offense Level of 38. The PSR also applied seven criminal history points, four of which derived from two prior

convictions for possession of controlled substances. Avila had been sentenced on the same date for each of these cases. He had received a six-month sentence in case 94 CR 1983, and a sentence of two years' custody in case 94 CR 670, suspended upon completion of the sentence in 94 CR 1983.

On June 8, 2007, the district court held a sentencing hearing. Both the government and Avila indicated that they did not object to the PSR. The district court sentenced Avila to 396 months' imprisonment, followed by ten years of supervised release.

## II. ANALYSIS

Avila raises three issues on appeal. First, he argues that there was a fatal variance between the conspiracy alleged in the indictment and the proof adduced at trial. Second, he argues that the testimony of several witnesses was irrelevant and unduly prejudicial. Specifically, he challenges the testimony of Sergeant Wildauer and statements of several witnesses relating to Avila's guilt.[2] Avila claims that the cumulative effect of these errors merits reversal. Finally, Avila claims that the district court erred in calculating the sentencing range by relying on an

---

[2] Avila also challenges the testimony of Agent Reeves. However, this claim rests on his contention that Reeves testified to facts regarding a separate conspiracy that Avila did not join. Because this analysis is directly relevant to whether the alleged variance prejudiced Avila, we will discuss it in that context.

incorrect offense level and misinterpreting Avila's criminal history. We discuss each issue in turn.

## A. Avila's Variance Claim

To obtain a conspiracy conviction against a defendant, the government must prove that (1) two or more people agreed to commit an unlawful act, and (2) the defendant on trial knowingly and intentionally joined in the agreement. *United States v. Dumes*, 313 F.3d 372, 382 (7th Cir. 2002). Thus, two or more individuals conspired together if the evidence demonstrates that they "embraced a common criminal objective," even if they did not know each other or participate in every aspect of the crime. *United States v. Jones*, 275 F.3d 648, 652 (7th Cir. 2001).

On the other hand, two individuals cannot be said to have conspired together "when each of the conspirators' agreements has its own end, and each constitutes an end in itself." *United States v. Sababu*, 891 F.2d 1308, 1322 (7th Cir. 1989). This issue often arises in the context of "hub-and-spoke" conspiracies, where a defendant serves as a "hub" connected to each of his co-conspirators via a "spoke." *See United States v. Swafford*, 512 F.3d 833, 842 (6th Cir. 2008), *cert. denied*, 129 S. Ct. 329 (2008). In this context, we have said that to prove the existence of a single conspiracy, "a rim must connect the spokes together, for otherwise the conspiracy is not one but many." *United States v. Bustamante*, 493 F.3d 879, 885 (7th Cir. 2007), *cert. denied*, 128 S. Ct. 1460 (2008). This "rim" is an agreement to further a single design or purpose, a

characteristic that we have noted is the defining quality of a conspiracy. *United States v. Thomas*, 520 F.3d 729, 733 (7th Cir. 2008). Thus, for a single, overarching conspiracy to exist, "'those people who form the wheel's spokes must have been aware of each other and must do something in furtherance of some single, illegal enterprise.'" *Bustamante*, 493 F.3d at 885-86 (quoting *United States v. Levine*, 546 F.2d 658, 663 (5th Cir. 1977)).

Defendants who argue that the evidence at trial established the existence of not one conspiracy but many often assert that a "fatal variance" exists between the crime charged and the proof at trial. *See, e.g.*, *United States v. Payne*, 226 F.3d 792, 795 (7th Cir. 2000); *United States v. Severson*, 3 F.3d 1005, 1009-10 (7th Cir. 1993). Avila makes such a challenge here. He argues that a fatal variance exists in this case because the government presented evidence at his trial that was relevant only to a conspiracy that he did not join. For example, he points to testimony of Agents Burkhart and Reeves regarding drugs seized or purchased in controlled buys from other Mexican nationals in the Indianapolis area with whom Avila claims he shared no common goal or purpose.

"A variance arises when the facts proved by the government at trial differ from those alleged in the indictment." *United States v. Stigler*, 413 F.3d 588, 592 (7th Cir. 2005). We treat a conspiracy variance claim as nothing more than a challenge to the sufficiency of the evidence supporting the jury's finding of a conspiracy. *United States v. Nitch*, 477 F.3d 933, 936 (7th Cir. 2007), *cert. denied*, 127 S. Ct. 3024 (2007); *United States v. Townsend*, 924

F.2d 1385, 1389 (7th Cir. 1991). Thus, to prevail Avila must show that (1) the evidence at trial was insufficient to support a finding that he belonged to a single conspiracy, and (2) he was prejudiced by the variance. *Stigler*, 413 F.3d at 592.

Under ordinary circumstances, "[s]ufficiency of the evidence challenges rarely succeed because we owe great deference to the jury's verdict." *United States v. Melendez*, 401 F.3d 851, 854 (7th Cir. 2005). In this case, Avila faces an even higher burden because he failed to move for a judgment of acquittal. *See United States v. Meadows*, 91 F.3d 851, 854 (7th Cir. 1996). Therefore, our review is for plain error, and we will reverse Avila's conviction only if a miscarriage of justice occurred " 'of such magnitude that [Avila] probably would have been acquitted absent the error.' " *Id.* (quoting *United States v. Valencia*, 907 F.2d 671, 685 (7th Cir. 1990)).

Avila argues that his conviction must be reversed because (1) there was insufficient evidence to show that he belonged to any conspiracy, and (2) he was prejudiced by the admission of evidence of a large-scale conspiracy that he did not join. For the reasons that follow, we reject both of his arguments.

1. *Whether Sufficient Evidence Established that Avila Joined a Single Conspiracy*

In order to prove that Avila participated in a conspiracy, the government must prove that he knowingly and intentionally joined in an agreement with one or more other

individuals to commit an unlawful act. *United States v. Gardner*, 238 F.3d 878, 879 (7th Cir. 2001). We have recognized that the sale of drugs, without more, does not constitute a conspiracy because the sale itself is a substantive crime. *United States v. Clay*, 37 F.3d 338, 341 (7th Cir. 1994). Thus, "the government must prove that the defendant conspired to commit some crime beyond *that* agreement to sell drugs." *United States v. Rock*, 370 F.3d 712, 714 (7th Cir. 2004).

As we have often noted, "[a]n agreement need not be explicit; a tacit agreement may support a conspiracy conviction." *United States v. Handlin*, 366 F.3d 584, 589 (7th Cir. 2004); *see also United States v. Messino*, 382 F.3d 704, 709 (7th Cir. 2004). Furthermore, the government need not present any direct evidence of the agreement; circumstantial evidence alone will suffice. *United States v. Zarnes*, 33 F.3d 1454, 1465 (7th Cir. 1994). Such evidence may include sales of large amounts of drugs, prolonged cooperation, a level of mutual trust between the parties, standardized dealings, and sales on a consignment or "fronted" basis. *See, e.g.*, *Bustamante*, 493 F.3d at 884-85; *United States v. Contreras*, 249 F.3d 595, 599 (7th Cir. 2001); *Zarnes*, 33 F.3d at 1465.

Proving that Avila joined the conspiracy alleged in the indictment does *not* require that the government prove he conspired with the *individuals* named in the indictment. The key to proving a conspiracy is that the defendant joined the *agreement*, not the group. *Townsend*, 924 F.2d at 1389-90. Thus, the government need not establish with whom the defendant conspired. *Contreras*, 249 F.3d at 598.

It need only prove that the defendant conspired with *anyone* to commit the crime charged in the indictment. *See Townsend*, 924 F.2d at 1389.

Avila claims that the government failed to meet its burden at trial because it did not prove that he conspired to commit some crime beyond an agreement to sell drugs to Avant and Nava-Rubio. He also implies that the "single design or purpose" defining a conspiracy must be more specific than simply to further distribute drugs. He cites as an example the "singular purpose of the agreement" in *Thomas*, which was "to transform this block of West 50th Place into what was essentially an open-air drug bazaar." 520 F.3d at 733-34. Such a specific purpose is not required, however.

All that is necessary to establish a drug distribution conspiracy is an understanding related to the subsequent distribution of narcotics. *Clay*, 37 F.3d at 341. The government need only show an agreement that goes beyond the *individual* sale between buyer and seller. *See Rock*, 370 F.3d at 714.

Here, there is substantial evidence that Avila expected and encouraged Avant and Nava-Rubio to redistribute the drugs he had provided. Avila always fronted the drugs to both Nava-Rubio and Avant. Nava-Rubio testified that over the course of their relationship, Avila fronted him 100 pounds of methamphetamine, 20 to 30 kilograms of cocaine, and 300 to 400 pounds of marijuana. Similarly, Avant testified that Avila fronted him 3 to 4 pounds of methamphetamine per month, 5 to 6 kilograms of cocaine per month, and 500 total pounds of marijuana.

Because Avila fronted these drugs in return for pay-ment after Nava-Rubio and Avant sold them, he was dependent upon the further resale of the drugs to make a profit.

The evidence also established that Avila demonstrated a high level of trust and confidence in Avant and Nava-Rubio. He provided both with large quantities of drugs without requiring any payment until the drugs were resold. In one of the intercepted calls, he told Nava-Rubio about a car with a hidden compartment and described how he had used it to transport drugs on a previous occasion. It is unlikely that Avila would have acted this way with Avant or Nava-Rubio if they were engaged in a mere buyer-seller relationship.

Furthermore, the defendant's own conversations with Nava-Rubio reveal the conspiratorial nature of their relationship. During one of the intercepted conversations, Nava-Rubio and Avila discussed Nava-Rubio selling the methamphetamine Avila had fronted him to a "white guy," and Avila told Nava-Rubio to send the money back with Espinoza-Sarco. Given this exchange, Avila cannot reasonably deny that he intended for the drugs to be resold.

The large amounts of drugs, the sales on consignment, the level of trust and confidence, and the explicit discus-sions of redistribution all provide overwhelming evidence of Avila's conspiratorial relationships with Avant, Nava-Rubio, and Espinoza-Sarco.

In addition, the evidence supports the jury's finding that Avila engaged in the *specific* crime charged in the

indictment: an agreement to distribute 500 grams or more of a mixture or substance containing methamphetamine, 50 grams or more of methamphetamine, 500 grams or more of a mixture or substance containing a detectable amount of cocaine,[3] and 100 kilograms or more of a mixture or substance containing a detectable amount of marijuana. The evidence established that Avila sold Nava-Rubio over 45 kilograms of methamphetamine, 20 to 30 kilograms of cocaine, and approximately 136 to 181 kilograms of marijuana.[4] Avila sold Avant 1361 to 1814 grams of methamphetamine per month, 5 to 6 kilograms of cocaine per month, and 227 total kilograms of marijuana.[5] Even if Avila supplied Avant for only one month, this would add up to, at a minimum, 46 kilograms of methamphetamine, 25 kilograms of cocaine, and 362 kilograms or more of marijuana.[6] Because this clearly exceeds the amount of drugs charged in the in-

---

[3] One kilogram contains 1,000 grams. Thus, even one kilogram each of methamphetamine and cocaine would exceed the amounts charged in the indictment.

[4] Rounded to the nearest kilogram, 45 kilograms is equivalent to 100 pounds, 136 kilograms is equivalent to 300 pounds, and 181 kilograms is equivalent to 400 pounds.

[5] Rounded to the nearest gram, 1361 grams is equivalent to three pounds and 1814 grams is equivalent to four pounds. Rounded to the nearest kilogram, 227 kilograms is equivalent to 500 pounds.

[6] These estimates are conservative, using the lowest quantity supported by the testimony and rounding down to the nearest kilogram.

dictment, there is ample evidence to support the jury's verdict that Avila engaged in the charged conspiracy.

2. *Whether Avila Was Prejudiced by Evidence of a Conspiracy He Did Not Join*

Avila claims that he was prejudiced at trial because the prosecution presented evidence that was relevant only to a conspiracy that he did not join. Avila cites the following to support his claim: (1) testimony of Agent Burkhart that a large-scale drug organization of Mexican nationals existed in Indianapolis and that the FBI had seized large quantities of drugs from numerous members of that organization; (2) testimony of Agent Reeves that he had made several undercover drug purchases from Soto-Nava on a consignment basis; and (3) statements by Burkhart, Reeves, Avant, and Nava-Rubio that Avila was working in a "drug dealing enterprise."[7] Avila argues that he was prejudiced by the inclusion of this inadmissible evidence in the government's case. He also argues that the errors affected his sentence.

We need not decide whether this evidence was admissible because, as described below, Avila did not suffer any prejudice. We should note, however, that Avila's claims regarding the improper testimony are not entirely without merit. Specifically, Agents Burkhart and Reeves testified to drug activities with which Avila had little or

---

[7] We will discuss the third argument in detail in the context of Avila's evidentiary challenges.

no demonstrated connection. As noted above, although a defendant does not need to know with whom he is conspiring to be convicted of conspiracy, *Jones*, 275 F.3d at 652, co-conspirators "'must have been aware of each other and must do something in furtherance of some single, illegal enterprise,'" *Bustamante*, 493 F.3d at 885-86 (quoting *Levine*, 546 F.2d at 663). We do not agree with the government that the testimony of Agents Burkhart and Reeves meets this standard.

For example, Agent Burkhart did not state from whom the quantities of drugs she described were seized, nor did she connect those drugs to Avila. Without any explanation as to the origin of the drugs seized, there is no evidence that Avila engaged with the distributors of these drugs in a single illegal enterprise or shared with them some common goal. Absent this connection, the government provided no evidence to explain how Avila conspired to possess or distribute the seized drugs.

The testimony of Agent Reeves regarding undercover drug purchases made from Soto-Nava was similarly questionable. One recorded telephone call revealed a conversation between Avila and Soto-Nava, but they did not discuss drugs. Avant testified that he had obtained drugs from Soto-Nava and that Soto-Nava introduced him to Avila. He stated that the purpose of this introduction was so that Avant could obtain more drugs. However, Avant's testimony did not establish that Avila knew that Avant had other suppliers or that Avila and Soto-Nava worked together in any common enterprise. Simply demonstrating that both distributed

drugs to the same individuals is not sufficient to show that they conspired together. *See id.*

Regardless of whether this evidence was admissible, however, Avila cannot succeed on his claim because he did not suffer any prejudice from its introduction at trial. As described above, to obtain a reversal, Avila must show that he was prejudiced by the alleged variance. *Stigler*, 413 F.3d at 592. Because a variance may prejudice a defendant both at trial and at sentencing, we analyze the effect of the evidence on both Avila's conviction and sentence. *See Bustamante*, 493 F.3d at 887.

First, we hold that Avila's conviction was not a result of prejudice from the irrelevant evidence. As noted above, because our review is for plain error, we will reverse Avila's conviction only if a miscarriage of justice occurred "'of such magnitude that [Avila] probably would have been acquitted absent the error.'" *Meadows*, 91 F.3d at 854 (quoting *Valencia*, 907 F.2d at 685).

It is highly unlikely that Avila would have been acquitted had Agents Burkhart and Reeves been prevented from testifying about these drug transactions or seizures. As described above, the record is replete with evidence that Avila conspired with Avant, Nava-Rubio, and Espinoza-Sarco to distribute large amounts of drugs. Avila used Espinoza-Sarco to deliver drugs on his behalf and collect the money. He "fronted" Avant and Nava-Rubio large amounts of drugs for no payment in advance. The testimony regarding Avila's drug dealings alone was enough to support the jury's verdict.

Furthermore, we have previously held that a defendant was not prejudiced by a variance where "'the jury had no need to look beyond [the] defendant's own words in order to convict.'" *Bustamante*, 493 F.3d at 887 (quoting *Townsend*, 924 F.2d at 1411). Where the government produced recorded conversations of the defendants directly discussing drug transactions with their co-conspirators, we have noted that this evidence alone was sufficient to support the jury's finding. *See id.*; *Townsend*, 924 F.2d at 1411. Similarly here, the jury could hear for itself that Avila discussed with Nava-Rubio the sale of drugs to the "white guy." This evidence alone was sufficient to support the jury's finding, and we see no prejudice from admitting the testimony of Agents Burkhart and Reeves.

Nor are we persuaded that Avila was prejudiced in his sentence. Although the PSR recited the quantities of drugs that were seized from the entire drug organization, these quantities were not factored into the Guidelines range applied.[8] Instead, the range was apparently based on the quantities of drugs listed in paragraph 13 of the PSR— the drugs that Avila supplied to Avant.

Avila also claims that the court relied on the improper evidence when it noted that the sentence "reflects the

---

[8] Although the Guidelines range was incorrectly calculated, *see infra* Section II.C, this was not a result of the claimed variance. There is no evidence from the PSR that the range was increased due to the quantities of drugs seized from other members of the alleged conspiracy. We discuss this error in detail later in this opinion.

defendant's high level of involvement in the conspiracy, as well as his repeated violations of the law and his role in the distribution of huge quantities of drugs in central Indiana and elsewhere." (Sent. Hr'g at 25.) However, this does not demonstrate that the court based Avila's sentence on anything other than the drugs he supplied to Avant and Nava-Rubio, and Avila's criminal history. The quantities of drugs in those transactions were substantial, and there is no doubt that Avila played a key role in orchestrating the deals.

We also are unconvinced by Avila's argument that he was prejudiced in his sentence because the prosecutor urged the judge to rely on improper evidence. Although the prosecutor advocated a long sentence because of "the amount of harm [Avila] did by being part of this conspiracy that pumped so much poison into our community," and to avoid "unwarranted disparities" with his alleged co-conspirators, Avila cites nothing from the judge indicating that he relied on these arguments in imposing the sentence. The judge's comments during sentencing were well-supported by Avila's own actions, his prior criminal history, and his demonstrated disrespect for the law. Nothing in the sentencing hearing suggests that had the judge refused to admit the improper evidence, he would have imposed a different sentence.

In sum, we find ample support for the jury's verdict that Avila was a member of the conspiracy charged in the indictment. The record contains direct testimony that Avila himself distributed drugs in quantities that exceeded those charged in the indictment. Furthermore, Avila's

relationships with Avant and Nava-Rubio reveal that they were not simply engaged in a buyer-seller relationship. Because this evidence supports the jury's verdict, Avila was not prejudiced at trial by the admission of any evidence of a separate conspiracy. Nor was he prejudiced at his sentencing, because the judge's reasoning was well-supported by evidence of drug transactions directly attributable to Avila.

### B. Avila's Evidentiary Challenges

Avila also challenges the testimony of several government witnesses as irrelevant and unduly prejudicial. Ordinarily, we review a district court's evidentiary rulings for an abuse of discretion. *United States v. Hale*, 448 F.3d 971, 985 (7th Cir. 2006). However, Avila never objected to any of the challenged testimony at trial. Where a party has failed to raise an objection at trial, our review is only for plain error, *United States v. Swan*, 486 F.3d 260, 263 (7th Cir. 2007), and we will reverse only if the errors resulted in an "actual miscarriage of justice" such that the defendant "probably would have been acquitted but for the erroneously admitted evidence," *United States v. Price*, 418 F.3d 771, 779 (7th Cir. 2005) (quotations omitted).

First, Avila claims that testimony of Sergeant Wildauer regarding the use of hidden compartments in drug trafficking was irrelevant and unduly prejudicial. Next, he claims that several witnesses gave prejudicial and improper legal opinions that Avila participated in the charged conspiracy. He claims that the cumulative effect

of these errors deprived him of a fair trial. We address each argument in turn.

### 1. Testimony of Sergeant Wildauer

At trial, the government called Sergeant Wildauer to testify to the use of hidden compartments in drug trafficking. Wildauer explained several photographs of hidden compartments that he had discovered in cars, all of which came from other cases he had investigated. He also explained how "drug cartels" used this method to transport drugs.

Expert testimony may be admitted if the witness's specialized knowledge will help the trier of fact to understand the evidence. Fed. R. Evid. 702; *United States v. Nobles*, 69 F.3d 172, 183 (7th Cir. 1995). "The operations of drug dealers are generally an appropriate subject for expert testimony. Because the clandestine nature of narcotics trafficking is likely to be outside the knowledge of the average layman, law enforcement officers may testify as experts in order to assist the jury in understanding these transactions." *Nobles*, 69 F.3d at 183 (quotations and citations omitted).

In *United States v. Hubbard*, 61 F.3d 1261 (7th Cir. 1995), we held that the district court did not abuse its discretion in allowing a police officer who was not directly involved in the defendant's case to testify about dealers' typical use of hidden compartments in automobiles to transport narcotics. *Id.* at 1274-75. We noted that the expert in *Hubbard* did not offer an opinion regarding the

defendant's conduct, but merely spoke in general terms. *Id.* at 1275. Finally, we stated that nothing in the expert's testimony "foreclosed or hampered the defense in offering innocent explanations for evidence that [the expert] had identified as consistent with narcotics trafficking." *Id.*

Avila's case is similar to the situation we addressed in *Hubbard*. Nava-Rubio and Avant testified that Avila or his agents transported large amounts of drugs using hidden compartments. The government produced Sergeant Wildauer to help the jury understand this evidence and how it related to the typical operations of drug dealers. Thus, the evidence was relevant in that it helped to explain other testimony.

Even relevant evidence may be excluded if the danger of unfair prejudice outweighs its probative value. Fed. R. Evid. 403. "Evidence is unfairly prejudicial only if it will induce the jury to decide the case on an improper basis, commonly an emotional one, rather than on the evidence presented." *United States v. Pulido*, 69 F.3d 192, 201 (7th Cir. 1995) (quotations omitted). This is not the case here. Nothing about Wildauer's testimony was so prejudicial that it would cause the jury to decide the case on an improper basis. As in *Hubbard*, Wildauer never offered an opinion regarding Avila's specific involvement, and Avila had every opportunity to cross-examine him. Considering the wealth of evidence against Avila, it is unlikely that the jury convicted him on the basis of the testimony about hidden compartments or a comment regarding "drug cartels."

2. *The "Legal Opinions" of Several Witnesses*

The primary issue at trial was Avila's identity. During opening statements, Avila's counsel stated:

> In this case . . . the government's going to put on a lot of evidence showing that there was a conspiracy. . . . The question here, though, is whether Martin Avila was a part of that conspiracy or not. Martin Avila denies being any part of that conspiracy. . . . He will tell you that he does not know Rene Nava-Rubio, has never had any contact with him, has never had any dealings with that man.
>
> Now, there was somebody using the name Martin Avila in this conspiracy, but the question that you have to answer is whether this man is the one that was doing that. Just because the name Martin Avila is on the conspiracy doesn't mean that this man is the man that was doing that work.

To combat this argument, the government asked several witnesses—Special Agent Burkhart, Nava-Rubio, and Avant—to identify the defendant and state whether he was the one who participated in the "drug trafficking conspiracy," "drug dealing enterprise," or "drug trafficking organization." They all answered affirmatively.

It is true that it would be improper for the prosecutor to elicit testimony about whether Avila was involved in a "conspiracy" or the like, because it implies a legal conclusion. However, with respect to Nava-Rubio and Avant, it is apparent from the record that the goal of this

questioning was to establish the identity of the defendant as the individual who sold them drugs. Even Avila's counsel referred to the interactions among these individuals as "a conspiracy." Although the form of the prosecutor's questions leaves much to be desired, Avila never objected at trial. The prosecutor simply was trying to get to the ultimate issue of Avila's identity, a line of questioning that was entirely proper and, indeed, necessary given Avila's defense. We cannot say that but for the imprecisely worded questions Avila would have been acquitted.

With respect to Special Agent Burkhart, the government concedes on appeal that her testimony was improper. Burkhart identified Avila from a photograph as the individual who took part in the conspiracy and explained that the photo accurately reflected his appearance from 2000 through 2002. Cross-examination revealed, however, that she had not met Avila until after he was arrested in 2005. Nonetheless, we fail to see how this could have prejudiced Avila. The jury was fully aware of the inaccuracies in Burkhart's testimony, because they were revealed on cross-exam. In addition, as we have previously established, Avila never objected, and ample evidence properly supported his conviction. Thus, the error was harmless.

### 3. Cumulative Errors

Avila argues that even if the individual effects of these errors were harmless, their cumulative effect denied him his right to a fair trial. We have noted that "[c]umulative

errors, while individually harmless, when taken together can prejudice a defendant as much as a single reversible error and violate a defendant's right to due process of law." *United States v. Allen*, 269 F.3d 842, 847 (7th Cir. 2001). To demonstrate cumulative error, Avila must show that (1) at least two errors were committed during the trial, and (2) these errors "so infected the jury's deliberation that they denied [Avila] a fundamentally fair trial." *Alvarez v. Boyd*, 225 F.3d 820, 824 (7th Cir. 2000). We must use care not to magnify the importance of errors that had little significance in the trial setting. *Id.* at 825. We will reverse only if "the effect of the errors, considered together, could not have been harmless . . . [or] that but for the errors, the outcome of the trial probably would have been different." *Id.* (citation omitted).

We doubt that the jury's verdict would have been different even if the trial court had excluded all of the testimony that Avila now challenges. As we have already noted numerous times, overwhelming evidence properly supported Avila's conviction. Avant and Nava-Rubio described relationships with Avila that were clearly conspiratorial, and their testimony was bolstered by recorded conversations. Even the cumulative effect of any potential errors did not deny Avila a fair trial.

### C. *Avila's Sentence*

Avila's final arguments on appeal involve his sentence. He claims that his sentence was based on an incorrect Guidelines range, and that the district court improperly

calculated his criminal history points. Because Avila failed to challenge the PSR or raise these arguments before the district court, review is again for plain error, and a remand is warranted only if the error affected Avila's substantial rights. *United States v. Garrett*, 528 F.3d 525, 527 (7th Cir. 2008).

Avila first argues that the district court applied the wrong base offense level. "A sentence based on an incorrect Guideline range constitutes an error affecting substantial rights and can thus constitute plain error, which requires us to remand unless we have reason to believe that the error did not affect the district court's selection of a particular sentence." *Id.* The PSR computed that Avila had distributed drugs with a marijuana equivalency rate of 24,234 kilograms. The PSR recommended, and the district court applied, a base offense level of 38. With seven criminal history points, this resulted in a Guidelines range of 324-405 months. However, the Guidelines clearly establish that the correct base offense level for between 10,000 and 30,000 kilograms of marijuana is 36. This would have resulted in a Guidelines range of 262-327 months.

The district court imposed a 396-month sentence, which was within the incorrectly applied Guidelines range. During sentencing, the judge gave no indication that he would have imposed the same sentence had the range been lower. This error requires remand.

The government argues that this error was harmless because the evidence at trial supported a finding that Avila distributed the equivalent of more than 30,000

kilograms of marijuana. However, the district court apparently did not rely on that evidence. It found that Avila distributed the equivalent of 24,234 kilograms of marijuana, and neither the government nor Avila objected to that finding. It appears that the district court simply applied the wrong range, which constitutes plain error.

Avila also argues that the district court miscalculated his criminal history points. At sentencing, Avila received a total of seven criminal history points, which resulted in a Guidelines range of 324-405 months. Six criminal history points would have resulted in a range of 262-327 months.[9] In calculating Avila's criminal history points, the PSR assigned two criminal history points for each of his two prior controlled substance convictions. Avila was sentenced for both convictions on the same day. In case 94 CR 1983, he received a sentence of sixth months' custody. In case 94 CR 670 he received a sentence of "two years custody suspended upon completion of sentence in 94 CR 1983."

Two criminal history points are imposed for each prior sentence of imprisonment of at least sixty days. U.S. Sentencing Guidelines Manual § 4A1.1(b) (2007). However, where the imposition or execution of a sentence was totally suspended, only one criminal history point is imposed. *Id.* § 4A1.2(a)(3). Because the district court did

---

[9] If the correct base offense level of 36 had been applied, 7 criminal history points would result in a range of 262-327 months, while 6 criminal history points would result in a range of 235-293 months.

not address whether Avila's sentence in case 94 CR 670 constitutes a "totally suspended" sentence within the meaning of § 4A1.2(a)(3), we have in front of us only the limited information available in the PSR. For this reason, we decline to decide this issue for the first time on appeal. Instead, on remand the district court should inquire into the circumstances of the prior sentence and decide whether it warrants one or two criminal history points.

### III. CONCLUSION

We AFFIRM Avila's conviction and REMAND for resentencing with instructions to (1) consider the Guidelines range that properly reflects the amount of drugs Avila distributed and (2) determine whether the sentence in case 94 CR 670 was "totally suspended" within the meaning of U.S.S.G. § 4A1.2(a)(3).