## In the
## United States Court of Appeals
### For the Seventh Circuit

No. 08-1854

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

JOSEPH O. LEWIS,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Northern District of Indiana, Fort Wayne Division.
No. 07 CR 12—**Theresa L. Springmann,** *Judge.*

ARGUED APRIL 10, 2009—DECIDED JUNE 1, 2009

Before BAUER, FLAUM, and EVANS, *Circuit Judges*.

EVANS, *Circuit Judge.* In January 2007, three men robbed a bank in Fort Wayne, Indiana, and Joseph Lewis was pegged as one of the robbers. Lewis claimed that the police had the wrong man, but at trial the government presented evidence to the contrary, including testimony from his cousin, whose house was the site of Lewis's arrest and the arrest of the two other men allegedly involved in the heist. The jury found Lewis guilty of armed bank robbery, and he appeals.

During Lewis's trial, several bank employees testified about the day's events. Although their accounts varied a bit—which is not at all unusual—this is the story that emerged. On the afternoon of the robbery, the bank was infiltrated by three men—one with a gun—who eventually grabbed money from the vault and one of the drawers. The first was a shorter black man, of medium build. His face was covered with a ski mask, he wore latex gloves, and he had a dark top over a jersey with a number seven on it. The second bandit was a tall, slender black man, also wearing a ski mask and equipped with latex gloves. He was wearing greenish-blue windbreaker pants and white tennis shoes. The third robber went to the copy room, where he restrained the assistant manager. Feeling frightened, the manager kept her eyes closed during the encounter but testified that she could tell the robber was black from "his voice." She also recalled brushing up against the robber's clothing, which felt soft. Another teller caught a glimpse of the fellow in the copy room and described him as a large man. A bank surveillance photo showed the torso and legs of one of the men who was wearing a tan sweatshirt with a dark stripe down the sleeve. Another teller testified that one of the thieves had braids or dreadlocks.

With their loot in tow—a modest take of $17,049.92 (compliments to the Tower Bank of Fort Wayne for being so exact!)—the three fled the bank in a brown car. Unbeknownst to them, they also left the bank with a hidden GPS tracking device embedded in a stack of Jacksons. Police officers received a page when the GPS unit started to move. It led them to a residential neighbor-

hood a couple of miles from the bank. They were johnny on the spot, arriving at the scene in under 10 minutes. Shortly thereafter, the GPS unit stopped sending out a signal. The police, however, were able to pinpoint the house where the GPS stopped emitting its whereabouts. There, they hunkered down to see what developed.

Nobody came or left from the house until later that evening. At that time, Lewis's cousin, Kenyatta Lewis (who we will refer to as Kenyatta), returned from work to a big surprise—cop cars lined up in front of his house. Once he got wind of the situation he gave the police permission to search his home. Inside, the police found three men. One was a shorter black man who had a medium build. The second was a tall, slender black man with braids. The last, Lewis, was a stocky black man. The officers also found a gun, some $10,000 of the $17,000+ dollars taken from the bank, and the bank's broken GPS unit. In the attic and in the master bedroom the police discovered various items of clothing—including three knit ski masks or hats, a jersey with the number seven on it, white Nike tennis shoes, blue nylon pants, and a striped, tan sweatshirt—which matched the clothes described by tellers at the bank. Parked in the garage officers found a silver car that was registered to Lewis's wife. In the trunk was a box of unused vinyl gloves, and in the back seat officers discovered a discarded pair of the gloves. DNA testing later linked them to one of the men hiding out in Kenyatta's home. Later, the police found a brown car, matching the description of the getaway car, a few blocks from the bank. It apparently was ditched by the robbers and another car (probably the silver one) was used to get to Kenyatta's house.

Kenyatta testified that he had been at work on the day of the robbery and that nobody, including Lewis, had permission to be at his home. Kenyatta did, however, waver on whether Lewis had a way into the garage. At first, he testified that he had given Lewis the garage door opener over Thanksgiving, but on cross-examination he denied ever doing so. In any event, the garage was easily accessible. Kenyatta explained that he left a spare opener in his unlocked car, which was parked in the driveway. He also testified that he never gave Lewis the key to the door leading from the garage into the house. Before the robbery, Kenyatta testified, the door was in fine condition. The same could not be said after the robbery occurred—the door had been kicked in. Kenyatta also testified that the clothes taken from his home were not his, except for the tan, striped sweatshirt, which (perhaps obviously) he hadn't worn that day.

Lewis was interrogated by police officers later that evening, two of whom also testified at the trial. According to the officers, Lewis's story shifted throughout the interrogation. At first, Lewis denied that he was involved in the robbery. Later, he admitted that he was the "look out," and that he scoped out the bank a few days before the robbery occurred. Eventually, he claimed that on the day of the heist he met the three robbers (which included the other two men found at Kenyatta's home) at a gas station near the bank. He asserted that he told the others that he no longer wanted to be involved. He eventually parted ways with the other three and headed back to Kenyatta's. Right as he reached Kenyatta's home, the three "real" robbers came

screeching into the driveway. Somehow, the others man-
aged to drive to the bank, rob it, and reach Kenyatta's
home at the same time Lewis arrived. Lewis claimed
that he reached Kenyatta's at 1:57 p.m, although one of
the officers pointed out that he (along with several other
officers) was already there at that time and saw no cars
arriving or leaving. Nonetheless, Lewis claimed that two
of the thieves jumped out, while the third sped off in
the brown getaway car. One of the robbers then kicked
in the door to Kenyatta's home, and they both hid
there until uncovered by the police hours later.

The entire interrogation was recorded on a DVD. Al-
though the DVD was not played for the jury—we were
told at oral argument that it was six hours long[1]—the
unredacted DVD was admitted into evidence. Although
none of the police officers mentioned it while testifying,
Lewis also revealed on the DVD that he was previously
convicted of bank robbery and that several of his
family members were incarcerated. Near the end, he
also said he "aided and abetted" the robbery, another
statement left unmentioned by the officers during trial.
The trial counsel objected to the DVD's admission, claim-
ing that this last statement was unduly prejudicial and
improper opinion testimony by a lay witness. The
court overruled the objection but informed the jury that

---

[1] However, the DVD, which is part of the record, is just over
four hours long. One of the officers who interrogated Lewis
and testified during the trial also stated that the interview
lasted "over four hours," suggesting counsels may have
been mistaken about the length of the DVD.

Lewis was not a legal expert and instructed them that, by mentioning "aiding and abetting," Lewis was neither making a legal conclusion nor admitting to the crime charged. At the end of the proceedings, the court reassured the government that the jury could view the DVD during their deliberations "[i]f they so chose." Since the jury room was equipped with a DVD player, they could "review all of it or portions of it, however they select." After deliberating for a little less than four hours, the jury found Lewis guilty of robbing the bank.

Shortly after the trial, the government wrote to Lewis's trial counsel, informing him that it "inadvertently failed to disclose" the fact that Kenyatta had a felony conviction for dealing cocaine. Lewis responded by filing a motion for new trial, claiming that this failure violated *Brady v. Maryland*, 373 U.S. 83 (1963). The district court concluded that the government had indeed suppressed favorable impeachment evidence but nonetheless denied the motion, noting that Kenyatta's drug conviction, even if published to the jury, would not have changed the outcome of the trial. Lewis now appeals, with the help of newly appointed appellate counsel.

Lewis first argues that the evidence of his prior bank robbery conviction, which he repeatedly mentioned throughout the recorded police interrogation, was erroneously admitted. He maintains that the statements only show his propensity to commit bank robberies, a purpose at odds with Federal Rule of Evidence 404(b). Lewis did not testify at trial, thus the statements had no value as impeaching evidence. We must first address the

standard of review, which Lewis claims is a thorny issue. Believing that the objection was made off the record, Lewis urges us to look to the broader context of the proceedings to glean the precise nature of trial counsel's challenge. From that context, he contends, we can surmise that the Rule 404(b) objection was preserved, and thus he asks us to review the decision for an abuse of discretion.

There is no need, and no place, for such speculation. *See United States v. Rollins*, 544 F.3d 820, 834 (7th Cir. 2008). Lewis's objection to the DVD was made outside of the presence of the jury, but not outside of the record. There are two sets of transcripts—one includes just the testimony of the witnesses, while the other is more complete and recounts the exchange regarding the objection. It's clear from the latter transcript that Lewis raised no Rule 404(b) objection:

> Trial Counsel:  Well, then the Court's ruling is that the DVD is going in?

> The Court: The only objection is to that statement that, yeah, I aided and abetted?

> Trial Counsel: Yes, I object to it on the grounds that it is opinion testimony by a lay witness. It's Joe Lewis's making a legal conclusion. And again, it's unduly prejudicial.

The parties discussed the admissibility of the DVD for over 10 pages of transcript and never mentioned Lewis's statements regarding his prior robbery conviction. This failure to object forfeits the argument on appeal, and

consequently our review is only for plain error. *United States v. Gibson*, 170 F.3d 673, 677-78 (7th Cir. 1999). Under this onerous standard, we will only reverse if "the errors resulted in an actual miscarriage of justice such that the defendant probably would have been acquitted but for the erroneously admitted evidence." *United States v. Avila*, 557 F.3d 809, 820 (7th Cir. 2009) (citations and quotations omitted).

The strange manner in which the DVD was admitted into the record precludes Lewis from successfully meeting this burden. There is no evidence in the record that the jury ever heard Lewis's statement about the prior robbery. No portions of the DVD were played for the jury. And although two officers testified about the interrogation, neither mentioned Lewis's prior conviction. The unredacted DVD—rife with references to the prior conviction—was nonetheless admitted into evidence, and the jury had access to a DVD player during its deliberation. But there is no way to know (from the record before us) if the jury actually watched the DVD, let alone the parts that include Lewis's admissions. The jury deliberated for a little less than four hours, which, after accounting for even a minimal amount of time for discussion, suggests that it did not view the whole thing even if it viewed any portion of it at all. Lewis must prove that the admission of the evidence resulted in an "*actual* miscarriage of justice," *Avila*, 557 F.3d at 820 (emphasis added), which is impossible since it's questionable whether the jury actually watched the DVD.

For the same reason, Lewis's second challenge fails. During the interrogation he also mentioned his family's

criminal background, and he now argues, for the first time, that this evidence is unduly prejudicial. Fed. R. Evid. 403. Because this argument was never presented to the district court, we again review only for plain error, a standard that Lewis cannot meet since there is no evidence in the record that the jury reviewed the relevant parts of the DVD.

This is not to say that the district court properly admitted the unredacted DVD. Lewis's statements re-garding his prior bank robbery fly in the face of Rule 404(b). The evidence proves nothing beyond Lewis's proclivity for robbing banks, which is the exact inference that the rule is designed to root out. *United States v. Owens*, 424 F.3d 649, 653-55 (7th Cir. 2005). And his fam-ily's criminal history was irrelevant as it risked painting Lewis as just another member of a family that's not adverse to dabbling in criminal escapades. During oral argument here, the AUSA (who also tried the case) could not adequately explain why she declined to redact the DVD before seeking to admit it into evidence, or why she didn't simply play the important snippets of the interrogation during the trial. But the government's incomprehensible strategy does not excuse trial counsel's failure to object to such damaging evidence. While we cannot reverse based on this error, we leave open for another day the inquiry into trial counsel's effectiveness.

Lewis takes one last stab at the DVD. At one point in the interrogation, Lewis mentioned that he aided and abetted the bank robbery. Lewis emphasizes his lack of legal expertise and contends that his untrained conclusion

was misleading and unduly prejudicial. Because an objection was lodged in the district court, we review this matter for an abuse of discretion. *United States v. Price*, 418 F.3d 771, 779 (7th Cir. 2005). Again, Lewis must contend with the fact that the jury may not have even heard the "aiding and abetting" statements on the DVD. But here he has an additional hurdle to overcome. In response to the objection, the court instructed the jury that Lewis was not trained in the law and that any statement about aiding and abetting should not be taken as a legal conclusion or an admission of the elements of the offenses charged. Absent any evidence to the contrary, "we presume that the jury limited its consideration of the testimony in accordance with the court's instruction." *United States v. Mallett*, 496 F.3d 798, 802 (7th Cir. 2007). Lewis does not address the limiting instruction, let alone point to anything that would rebut this presumption; therefore, we conclude that the district court committed no reversible error.

Finally, Lewis asks us to review the district court's denial of his motion for a new trial based on the government's failure to disclose Kenyatta's prior felony conviction. We review the district court's denial of the motion for an abuse of discretion, viewing the evidence in the light most favorable to the prevailing party, in this case the government. *United States v. Warren*, 454 F.3d 752, 759 (7th Cir. 2006).

In order to win a motion for a new trial based on a *Brady* violation, the defendant must establish that the prosecution suppressed impeaching or exculpatory evidence

material to the case. The government does not dispute that it withheld favorable impeachment evidence. The focus, then, is on whether the evidence is material or, more precisely, whether its timely disclosure would have produced a different verdict. *United States v. Wilson*, 481 F.3d 475, 480 (7th Cir. 2007). Whether impeachment evidence is material depends on a number of factors, most importantly the strength of the case against the defendant.

Kenyatta's testimony is not the best, or only, evidence of Lewis's guilt. Kenyatta explained that Lewis did not have access or permission to be at his house on the day of the robbery. But even if that testimony was discredited, it would do little to alter the strength of the government's case. True, Kenyatta's testimony undercuts Lewis's version of the day's events—Lewis maintained that he was going to his cousin's home to watch cable television when the robbers burst in. But Kenyatta's testimony was far from the only evidence to undermine Lewis's side of the story. Lewis himself, during the interrogation, acknowledged that Kenyatta had no idea that he was going to be there. What's more, the GPS unit directed police, within minutes of the robbery, to Kenyatta's home. There, the police found three men, including Lewis, who matched the general descriptions of the three bank robbers, along with money taken from the bank. This beeline escape suggests that Lewis was in cahoots with the others. Lewis never explains why the robbers would come to Kenyatta's house—whose connection to the group was through Lewis—to seek refuge. There, the police also found a gun and three sets

of clothes, matching descriptions of the clothes worn by the robbers. Additionally, the police found a box of vinyl gloves—like those used by the robbers—in the silver car, along with a pair of gloves containing one of the robber's DNA. Add to this the broken GPS unit and the evidence becomes very convincing. On top of this circumstantial evidence, Lewis admitted that he scoped out the bank prior to the robbery. Taking this evidence in the light most favorable to the government, as we must, we find that the government's inadvertent with-holding of impeaching evidence regarding Kenyatta's drug conviction did not prejudice Lewis.

Accordingly, the judgment of the district court is AFFIRMED.