**NONPRECEDENTIAL DISPOSITION**
To be cited only in accordance with
Fed. R. App. P. 32.1

# United States Court of Appeals

**For the Seventh Circuit**
**Chicago, Illinois 60604**

Argued April 21, 2009
Decided June 23, 2009

**Before**

WILLIAM J. BAUER, *Chief Judge*

TERENCE T. EVANS, *Circuit Judge*

ANN CLAIRE WILLIAMS, *Circuit Judge*

No. 08-2814

| | |
|---|---|
| UNITED STATES OF AMERICA, *Plaintiff-Appellee*, | Appeal from the United States District Court for the Eastern District of Wisconsin. |
| *v.* | No. 07-CR-5 |
| COURTNEY WAINWRIGHT, *Defendant-Appellant*. | Rudolph T. Randa, *Chief Judge*. |

**O R D E R**

In early 2005, law enforcement agents in Racine, Wisconsin, began investigating a sharp increase in local heroin overdoses. As part of this effort, Courtney Wainwright was indicted for conspiring with, among unnamed others, his cousin, Allen Wainwright, to distribute heroin.[1] After hearing the evidence, including testimony from others arrested during the same investigation, a jury found Courtney guilty. Courtney now appeals, arguing that the evidence at trial was insufficient to support the jury's verdict because the

---

[1]For clarity, we will refer to the Wainwright cousins by their first names, Courtney and Allen.

witnesses were not credible and because their testimony only established that Courtney maintained routine buyer-seller relationships.  Because the evidence is sufficient to show Courtney conspired to distribute heroin, we affirm his conviction.

## Background

In June 2006, law enforcement agents were led to the Wainwright cousins through their supplier, Kazeem Afolabi.  Afolabi testified at trial that he began selling heroin in 2003 and that Regina, a customer who lived in Racine, introduced him to Courtney in early 2004. Regina acted as a middleman during their first deal, delivering the 25 grams of heroin she received from Afolabi to Courtney.  Afolabi stated that the following day, Regina told him that Courtney wanted to meet him personally to buy 100 grams of heroin.  Although Afolabi was initially worried that the request was a set-up for a robbery—Courtney was at that point a stranger to him and had requested a large amount of heroin—he agreed to the delivery because he trusted Regina.  Three days later, Afolabi, Regina, and Courtney met at Regina's home in Racine and traded 100 grams of heroin for a shoebox containing $10,000 in cash.  The success of the deal dispelled Afolabi's worries about Courtney, and he gave Courtney his phone number so they could transact without going through Regina.

Afolabi testified that a week after this second exchange, Courtney contacted him directly and requested another 100 grams.  Afolabi drove to Racine to deliver the heroin, where Courtney's cousin, Allen, picked him up at a Big Lots store and drove him to the lakefront to meet Courtney and make the exchange.  When Afolabi arrived, however, Courtney told him that the previous batch had been of poor quality and suggested that they make an exchange.  Afolabi agreed to the exchange because he did not want his customers to think he was "trying to play them for their money" and because he could return the bad heroin to his supplier.  According to Afolabi, Courtney later reported that the replacement batch of heroin was good, and, after that, Afolabi made weekly trips to Racine to deliver heroin to Courtney, with Allen always driving Courtney to their meeting place.

On one of Afolabi's routine weekly trips to Racine, he was met by only Allen, which made him uncomfortable since he was accustomed to dealing with Courtney.  Allen informed Afolabi that Courtney had moved to Ohio.  Allen then called Courtney to assure Afolabi that it was safe to do business without Courtney present.  Afolabi testified that, after Courtney moved to Ohio, he continued to deal with Allen directly and also sold Courtney heroin every other week.  These transactions with Courtney sometimes occurred in Racine and other times on the highway between Chicago and Indiana.  On one occasion, when Afolabi got lost on his way to Ohio to supply Courtney with heroin, he called Allen who arranged for Courtney to pick up Afolabi.  Afolabi testified that Courtney was a good customer; he always paid for his heroin in full and never bought drugs on credit.

In May 2006, law enforcement agents surveilled a meeting between Afolabi and Allen at a shopping center just south of the Illinois-Wisconsin border. Afolabi testified that at this meeting he sold Allen 20 to 25 grams of heroin. Agents apprehended Allen as he drove back to Wisconsin, but did not find any heroin on him, so they took him into custody on an outstanding warrant. Afolabi explained at trial that he talked to Allen two days later and learned that Allen had hidden the heroin "in his bottom" so that the police would not find it. Shortly thereafter, agents recorded a phone call between Courtney's half-brother, Jerome Booker, and Gregory Jackson, another Racine heroin distributor who bought drugs from Afolabi. During the conversation, Booker mentioned Allen's arrest and reported that Courtney needed to contact Afolabi so that he could find out what happened to Allen. Booker also told Jackson that Courtney wanted to "do something tonight" but would work only with Allen.

At trial, Jackson testified that he first learned that Afolabi was also supplying Courtney and Allen with heroin in July 2003. He also testified that he was sometimes present in Afolabi's car during transactions between Afolabi and Courtney, and that Allen worked as Courtney's driver during these meetings. One of Courtney's customers, Antonio Goodwin, testified as well. Goodwin explained that he bought $20 bags of heroin directly from Courtney on five occasions, and, after Courtney's move to Ohio, he bought heroin frequently from Allen. He also stated that sometimes he would place an order with Courtney and Allen would deliver the drugs to him. Goodwin further testified that Allen asked him to obtain two phones in his name for Allen and Courtney to use. In exchange for doing so, Goodwin received heroin from Allen.

Edward Lambert, a heroin distributor for Courtney, testified that after his release from prison in 2003, he ran into Courtney at a Racine barbershop. Courtney gave Lambert some money, and the next day Lambert called Courtney and asked to meet him. Courtney, with Allen driving, picked Lambert up and allowed him to accompany them on their heroin deliveries. Lambert explained at trial that he sold only cocaine before he was incarcerated, but decided to go into business with the Wainwright cousins after observing their success with heroin. Courtney sold Lambert a gram of heroin and showed him how to dilute the drug with lactose and package it in smaller quantities for resale. Courtney also loaned Lambert his phone for two days while he was out of town and gave Lambert permission to sell to his customers. Lambert continued selling to some of those customers even after Courtney returned. Lambert stated that he bought heroin from Courtney until he found a cheaper supplier.

Two other customers, Artis Echoles and Lori Cattelino, also testified about their interactions with the Wainwright cousins. Echoles testified that he bought $20 bags of

heroin from both Courtney and Allen and that he saw the two together whenever Courtney was in Racine. He explained that he initially bought more frequently from Courtney, and after Courtney moved to Ohio, he began buying more frequently from Allen. Cattelino testified that she met Courtney and began purchasing heroin from him when he lived in Racine. According to Cattelino, she stopped buying from Courtney after he moved to Ohio in 2000. Finally, Courtney's half-brother, Jerome Booker, testified that Courtney had lived in Ohio "all his life" and had never lived in Racine.

The jury found Courtney guilty on the single conspiracy count in the indictment. Courtney moved for a judgment of acquittal at the close of evidence and renewed that motion after the jury returned its verdict. The district court denied both motions and sentenced him to 168 months' imprisonment.

## Analysis

On appeal Courtney argues that the evidence at trial demonstrated only that he had a buyer-seller relationship with Allen, Afolabi, Lambert, and the government's other witnesses, and that evidence of this kind of relationship is insufficient to sustain a conviction for conspiracy. Courtney also contends that the witnesses were not credible because they had been promised lower sentences in exchange for their own testimony.

Courtney faces an uphill battle in challenging the sufficiency of the evidence. *United States v. Fuller*, 532 F.3d 656, 662 (7th Cir. 2008). In assessing such a challenge, "we review the evidence in the light most favorable to the verdict and will reverse only if no rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Williams*, 553 F.3d 1073, 1080 (7th Cir. 2009); *United States v. Farris*, 532 F.3d 615, 618 (7th Cir. 2008), *cert. denied*, 129 S. Ct. 967 (2009). We do not weigh the evidence or second-guess the jury's credibility determinations. *United States v. Carillo*, 435 F.3d 767, 775 (7th Cir. 2006).

Courtney correctly observes that a buyer-seller relationship alone is not enough to support a conspiracy conviction. *See United States v. Colon*, 549 F.3d 565, 567-68 (7th Cir. 2008); *United States v. Lechuga*, 994 F.2d 346, 349-350 (7th Cir. 1993) (en banc) (plurality). Instead, there must be evidence from which a rational jury could conclude that: (1) two or more people agreed to commit an unlawful act (here, distributing heroin); and (2) Courtney knowingly and intentionally joined in that agreement. *United States v. Rollins*, 544 F.3d 820, 835 (7th Cir. 2008). A sale of drugs, on its own, is not a conspiracy because "the sale itself is a substantive crime." *United States v. Avila*, 557 F.3d 809, 815 (7th Cir. 2009). The government must therefore show an agreement that goes beyond that individual sale between buyer and seller, such as an understanding related to the subsequent distribution

of drugs. *See id.* at 816; *United States v. Rock,* 370 F.3d 712, 714 (7th Cir. 2004). To determine whether a conspiracy was proved, we look for "evidence of a prolonged and actively pursued course of sales coupled with the seller's knowledge of, and a shared stake in, the buyer's illegal venture." *Fuller,* 532 F.3d at 662.

Here, Courtney's buyer-seller argument is unpersuasive. Allen, the coconspirator named in the indictment, did not sell Courtney heroin, nor did he buy it from him. Rather, Allen worked in concert with Courtney to buy heroin from Afolabi and sell it to third parties–conduct characteristic of a conspiracy. *See Rock,* 370 F.3d at 715 (noting that when defendants are on the same side of a sale of drugs to a third party, there is sufficient evidence of a conspiracy); *see also United States v. Johnson,* 437 F.3d 665, 675 (7th Cir. 2006) (noting that there is sufficient evidence to support a conspiracy where jury finds credible a witness who shows coconspirators were on the same side of a transaction). Afolabi, Jackson, Goodwin, and Lambert all testified that Allen acted as Courtney's driver and that the cousins frequently made heroin purchases and deliveries together. *See United States v. Gilmer,* 534 F.3d 696, 703-04 (7th Cir. 2008) (observing that it was unlikely coconspirator was "simply 'along for the ride' because common sense dictates that drug dealers want to minimize contacts throughout a conspiracy."). Afolabi reported that Allen stood in for Courtney on occasion and described a transaction in which Allen arranged for Courtney to meet him. The cousins' customers explained that they placed orders with both Courtney and Allen, and Goodwin noted that sometimes when he ordered heroin from Courtney, Allen would deliver it. Goodwin also testified that Allen asked him to obtain a phone in his name for Courtney to use. The evidence put forth at trial clearly shows that the cousins' agreement to distribute heroin extended far beyond individual buy-sell transactions, and that is enough to support the jury's conclusion that the agreement amounted to a conspiracy. *See Avila,* 557 F.3d at 816; *Carrillo,* 435 F.3d at 776.

Moreover, Courtney's conspiratorial conduct was not limited to his relationship with Allen. The evidence shows that he also conspired with Lambert. Here, Courtney's buyer-seller argument makes more sense: he did in fact sell heroin to Lambert. But he also did much more, setting Lambert up in the heroin business by teaching him how to dilute and bag the drug for sale. And Courtney gave Lambert access to his customer base by loaning him his cell phone. This evidence is sufficient to support the jury's conclusion that Courtney was involved in a conspiracy to distribute heroin. *See Fuller*, 532 F.3d at 664 (sufficient evidence of conspiracy where defendant taught coconspirator how to make crack); *United States v. Adkins,* 274 F.3d 444, 450-51 (7th Cir. 2001) (sufficient evidence of conspiracy where defendant set coconspirators up in the methamphetamine business).

Finally, Courtney makes a somewhat undeveloped argument that the testimony of his customers and supplier was not credible because those witnesses faced criminal charges

themselves and, therefore, had an incentive to assist the prosecution. We have observed that a witness's cooperation in exchange for a lighter sentence is not enough to upset the jury's decision to credit his testimony. *United States v. Bailey,* 510 F.3d 726, 734 (7th Cir. 2007). Moreover, both Courtney's counsel and the prosecutor pointed out the witnesses' motivations for testifying during the trial and advised the jury to factor that into its credibility assessments. So the fact that certain witnesses may have received reduced sentences in exchange for their cooperation with the government does not render their testimony incredible. *See Bailey*, 510 F.3d at 734.

AFFIRMED.