In the

# United States Court of Appeals

## For the Seventh Circuit

No. 09-1228

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

DAWAN A. WARREN,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Northern District of Indiana, Fort Wayne Division.
No. 1:07-CR-14-TLS—**Theresa L. Springmann**, *Judge.*

ARGUED OCTOBER 8, 2009—DECIDED JANUARY 26, 2010

Before EASTERBROOK, *Chief Judge,* MANION and TINDER, *Circuit Judges.*

TINDER, *Circuit Judge.* Dawan A. Warren was charged with bank robbery and using a firearm during a robbery. The jury in his first trial was unable to reach a verdict. He was tried again before a second jury and was convicted as charged. Warren appeals, contending that the second trial violated his Fifth Amendment right not to be put to double jeopardy and that the evidence was insufficient to sustain his conviction. We affirm.

## I. Background

In the afternoon on January 23, 2007, three men robbed a Tower Bank branch in Fort Wayne, Indiana. (This crime will be familiar to avid readers of the opinions of this court. We have already affirmed the convictions of two of the robbers, see *United States v. Moore*, 572 F.3d 334 (7th Cir. 2009), and *United States v. Lewis*, 567 F.3d 322 (7th Cir. 2009).) Detective Sergeant Craig Robison, a member of the Northeast Indiana Federal Bank Robbery Task Force, received a text message at 1:49 P.M., notifying him that a GPS tracking device had been activated. This meant that the device had been removed from the bank drawer in which it was located (the bank's bait money was embedded with the GPS device), signaling that the bank had been robbed. Detective Robison used his hand-held tracking device and headed to the area from where the device was transmitting—the 4200 block of Darby Drive. It took him only ten minutes to get there and when he arrived, the area was already flooded with other law enforcement officers. The GPS device indicated that it was within 49 feet of 4229 Darby Drive when it stopped transmitting.

Based on the GPS information and the observation of fresh tire tracks in the snow leading from the road to the garage at 4217 Darby Drive, law enforcement officers focused their attention on the house at that address. When the homeowner Kenyatta Lewis and his wife arrived, the officers obtained his consent to search the house. The search led to the discovery of three African-American men inside: Joseph Lewis, Kenyatta's cousin; Dontrell

Moore; and Dawan Warren. While officers were in the garage, Joseph Lewis opened the door from the house into the garage and was taken into custody. Then the officers entered the house and found Moore on a toilet in an upstairs bathroom. The officers discovered Warren, fully clothed, lying on a bed in an upstairs bedroom. He had his back toward the door and had a sheet or blanket on him. With his shotgun pointed at Warren, an officer ordered Warren to get up out of the bed. Warren did so. The officer testified that Warren appeared calm at the time.

Joseph Lewis, Moore, and Warren fit the general physical descriptions of the three bank robbers (the robbers had worn ski masks) given by the bank employee witnesses. Robber #1 was described as a black male, 5' 6" or 5' 8", and of medium build. He wore a white shirt with the number 7 on it (a Michael Vick jersey) under an opened sweatshirt or flannel shirt. He had on latex gloves and carried a gun. Robber #2 was a slender, black male with facial hair (his mask was off to the side). He was taller than Robber #1—6' or 6' 1"—and wore greenish, bluish windbreaker-type pants, brand new white tennis shoes, latex gloves and carried a light-colored canvas bag. Robber #3 was much larger, heavier, and stockier than the other two robbers. One of the robbers had long hair, described as possibly long braids or dread locks. Lewis was a heavy set, wide, African-American man and the shortest of the three suspects. Moore was described as "extremely tall and thin, six feet tall," was the tallest of the three men, and had some facial hair. Warren was much thinner than Lewis and

shorter than Moore. Further details about the robbery are contained in the *Moore*, 572 F.3d 334, and *Lewis*, 567 F.3d 322, decisions.

At Warren's trial, Kenyatta Lewis testified that he and his wife left early for work on January 23, 2007, and that no one had permission to be in his house that day. He testified that he did not know Warren and that Warren in particular had no permission to be in his house. Kenyatta testified that he did not recall any damage to the interior garage door leading into the house; police officers had found that the door had been damaged and splintered (as if it had been kicked open). Kenyatta identified the silver Buick LeSabre parked inside his garage as Joseph Lewis's wife's car. Kenyatta said that he did not store any clothing or other items in the attic in his house.

On the day of the robbery, the police collected evidence from Kenyatta's house. In the attic, the police found several articles of clothing of various sizes, including a pair of blue nylon-type, wind pants with a white stripe down the side and a few sweatshirts. A black plastic trash bag, a handgun, and money, later identified as bait money from the robbery, were taken from the attic and other items were collected from the bedroom.

As part of their investigation, officers searched two vehicles: a brown Buick Century which was found approximately one mile from the bank and identified as the getaway car, and the silver Buick LeSabre which was parked in Kenyatta's garage at a slight angle, suggesting

that the driver had pulled in quickly. The police found a clear vinyl glove on the front passenger floor area of the brown Buick Century. They found a pair of vinyl clear gloves on the rear seat of the silver Buick (Joseph Lewis's wife's car). Inside that vehicle's trunk, officers found a brown bag containing a box of gloves and a box of vinyl examination gloves. DNA testing of a sample obtained from one of the gloves from the back seat was consistent with Warren's DNA profile.

Upon Warren's arrival at the Allen County Jail on January 23, a $20 bill was taken from him along with other property. A $20 bait bill was missing from the bait money taken during the robbery. The police compared the serial number on the $20 bill taken from Warren with the serial number of the missing bait bill. They matched!

Warren was charged in an indictment with one count of bank robbery by force, violence, and intimidation in violation of 18 U.S.C. § 2113(a) and (d) and 18 U.S.C. § 2 and one count of knowingly using and carrying a firearm during and in relation to the bank robbery in violation of 18 U.S.C. § 924(c) and 18 U.S.C. § 2. Warren's first jury trial began on June 3, 2008 and continued for several days. On June 12, 2008, after deliberating for over six hours, the jury advised the court that it believed it was hung. The court proposed two alternatives for handling the situation and sought input from the parties' counsel. The court suggested asking the jury foreman whether, given the lateness of the hour (it was 7:30 P.M.), adjourning the proceedings for the evening

and resuming deliberations in the morning might be beneficial. If the foreman were to advise the court that the jury was hopelessly deadlocked and that adjourning for the night would not help, then that would be accepted and the court would take up any motions that were made.

The parties agreed with the court's proposal and the jury was brought into the courtroom. The court did as it had proposed, and the foreman advised that he did not think further deliberations would change any juror's view. The court had the foreman confer with the jury as a whole. After a short recess, the foreman stated that the jury did not feel that returning the next day to resume deliberations would be of any benefit because everyone had his or her opinion and the opinions weren't going to change. The court asked if there was anything that it could do to help facilitate further deliberations, and the foreman indicated that there was nothing that could be done. After that, the court asked the parties if they wanted the court to make any further inquiry of the jury, and the parties indicated that there was none. Thereafter, the court advised the jury: "I'm going to excuse you from further service in conjunction with this case. I . . . appreciate the efforts that you have put forward over the last four days . . . . And I note your very sincere efforts to try to reach a verdict in this case. . . . I'm going to release you. Your work with this case is now done."

After the jury left the courtroom, the court asked counsel, "[A]re there any motions to present at this time in light of this development?," and Warren's attorney

moved "for a mistrial . . . because the jury has repre-
sented . . . that it is hopelessly deadlocked." The judge gave
each side an opportunity to comment on the propriety of
an order for mistrial, to state whether they consented or
objected and to suggest any alternative. The government
indicated that there appeared to be no reason not to
consent, but wanted to ensure that its right to retry the
case was preserved. The court inquired of defense
counsel if there was any issue with the government's
right to retry the case; counsel indicated there was none.
Then the judge said, "What I would be inclined to do is . . .
grant the defendant's request for a mistrial based on
the record that we have before us regarding this jury
being deadlocked." The judge proposed a telephone
conference to reschedule the trial; a conference was
scheduled for the following week.

Warren's next jury trial began on October 1, 2008. This
second jury convicted him of both counts. The district
court sentenced Warren to 327 months' imprisonment
on Count 1 and 84 months on Count 2, to be served
consecutively. Warren appeals.

## II. Discussion

Warren challenges the constitutionality of his second trial
on double jeopardy grounds. He also argues that the
evidence was insufficient to convict him; this argument
seems to be directed solely toward his bank robbery
conviction.

## A. Double Jeopardy

Warren argues that his double jeopardy rights were violated because the district court never actually "declared" a mistrial at the close of his first trial. He also claims that the court erred in dismissing the jury and then, after the jury had left, soliciting a motion for a mistrial. Warren contends that his motion for a mistrial cannot be deemed his consent to a mistrial because the jury had already been dismissed.

No objection to the retrial was raised in the district court, so we review the double jeopardy claim for plain error. *United States v. Van Waeyenberghe*, 481 F.3d 951, 958 (7th Cir. 2007). Under this demanding standard of review, Warren must show that there was an error that was plain and affected substantial rights. *United States v. Ajijola*, 584 F.3d 763, 765 (7th Cir. 2009). And we will not exercise our discretion to correct the error unless it "seriously affect[ed] the fairness, integrity or public reputation of judicial proceedings." *United States v. Van Allen*, 524 F.3d 814, 819 (7th Cir. 2008) (citations omitted).

The Double Jeopardy Clause of the Fifth Amendment protects a criminal defendant from multiple prosecutions for the same offense. *Oregon v. Kennedy*, 456 U.S. 668, 671 (1982). However, double jeopardy does not preclude the government from retrying a defendant where a jury fails to reach a verdict in the first trial. *Richardson v. United States*, 468 U.S. 317, 324-26 (1984). In *United States v. Perez*, 22 U.S. (9 Wheat.) 579 (1824), the Supreme Court said that "the law has invested Courts of justice with the authority to discharge a jury from giving any

verdict, whenever, in their opinion, taking all the circumstances into consideration, there is a manifest necessity for the act, or the ends of public justice would otherwise be defeated." *Id.* at 580; *see also United States v. Jorn*, 400 U.S. 470, 481 (1971). Thus, a jury's inability to reach a verdict constitutes the "manifest necessity" that allows retrial. *Arizona v. Washington*, 434 U.S. 497, 509 (1978); *Perez*, 22 U.S. at 580; *see also Oregon v. Kennedy*, 456 U.S. at 672 (stating that the hung jury is the "prototypical example" of a case that meets the "manifest necessity" standard for lifting the double jeopardy bar); *Winston v. Moore*, 452 U.S. 944, 946 (1981) (Rehnquist, J., dissenting) (describing a hung jury as the "classical case of 'manifest necessity'"). In addition, double jeopardy does not bar a retrial of a defendant where the mistrial is granted on the defendant's motion unless "the conduct giving rise to the successful motion for a mistrial was intended to provoke the defendant into moving for a mistrial." *Oregon v. Kennedy*, 456 U.S. at 679; *see also United States v. Dinitz*, 424 U.S. 600, 610-11 (1978).

Warren errs in suggesting that a district court must articulate the pronouncement of a mistrial using some particular verbal formulation such as "I declare a mistrial" or "I order a mistrial." The case law does not require that. What the case law does require is "manifest necessity" or the defendant's consent to a mistrial (usually through a motion seeking that result). We have both here.

We defer to the district court's discretion in determining that nothing more could be done to enable the

first jury to reach a verdict and that therefore the jury should be discharged from further service. *See Jorn*, 400 U.S. at 481; *Perez*, 22 U.S. at 580. The district court inquired of the foreperson whether resuming deliberations the following day would help, and the foreperson said that he didn't think it would. The court gave the foreperson an opportunity to confer with the entire jury and then confirmed that nothing could be done to facilitate further deliberations. The parties seemed satisfied with the court's questioning of the jury before excusing them from further service. We find no error, let alone plain error, in the district court's determination that the first jury was unable to reach a verdict even with further deliberations. This provided the "manifest necessity" for discharging the jury without giving a verdict and removed the double jeopardy bar to a second trial. Once the district court had discharged the jury, there was no need for a motion for a mistrial. The district court's words and actions in discharging the jury had the effect of "declaring" a mistrial, a declaration clearly memorialized in two docket entries on the same date as the hung jury's discharge.

And we also have Warren's consent to a mistrial. Though Warren claims his counsel was merely humoring the court in moving for a mistrial, nothing the court did or said required Warren to move for a mistrial. The court did inquire of counsel (presumably directing her remarks to both the government and the defense) as to whether there were any motions, but the court did not single out either the prosecution or defense. In response, Warren's counsel stated that he was moving for a mistrial

"because the jury has represented . . . that it is hopelessly deadlocked." It was the hung jury that moved Warren to request a mistrial. While Warren's motion for a mistrial removes the double jeopardy bar (there is no suggestion that Warren was provoked into moving for a mistrial), it was not necessary in order to remove that bar—the jury's inability to reach a verdict had already removed it. The fact that the jury had been dismissed before Warren moved for a mistrial is inconsequential.

Warren also argues that the Federal Rules of Criminal Procedure require that a mistrial be formally "ordered" or "declared," citing Rules 26.3 and 31(b)(3). It is true that these rules do refer to the ordering or declaration of a mistrial, but they do not establish a rigid formula to which the trial court must conform to satisfy the constitutional and procedural interests at stake. (Warren cites no case law interpreting these rules as requiring a formal "order" or "declaration," and we have not found any either.) Here, the district judge gave both the defendant and the government an opportunity to suggest alternatives, to state whether they consented or objected, and to comment on the propriety of a mistrial under the circumstance of the jury's inability to reach a verdict, satisfying Rule 26.3's requirements. And no fair criticism can be made of the court's poll of the jury about whether a verdict could be reached, even after a recess for an evening's rest. Neither Rule 26.3 nor 31(b)(3) requires more. As the advisory committee notes to Rule 26.3 state, the rule is "designed to reduce the possibility of an erroneously ordered mistrial . . . . The Rule is not designed to change the substantive law governing mis-

trials." Fed. R. Crim. P. 26.3 advisory committee's note; *see also United States v. Berroa*, 374 F.3d 1053, 1058 (11th Cir. 2004) ("The primary effect of Rule 26.3 reveals itself as prophylactic; Rule 26.3 recalls to trial judges the critical importance of consultation with counsel."); *United States v. Sloan*, 36 F.3d 386, 394 (4th Cir. 1994) (stating that "the need for careful consideration of alternatives to mistrial . . . was one of the factors that led to [Rule 26.3]").

Although the trial judge did not phrase her ruling in the exact words as an "order" or "declaration" of a mistrial, what she said in discharging the jury, granting the defendant's motion for a mistrial, and setting the matter for a conference to select the next trial date was plenty to constitute such a ruling. Even if the judge could be criticized for not orally pronouncing a mistrial using the precise terms "order" or "declare," her actions were certainly the functional equivalent of those terms. Moreover, the docket entries that followed the court proceedings vividly emphasized that a mistrial had been ordered, if anyone was uncertain about how the first trial was terminated.

Warren has not shown any error, let alone plain error, in the district court's decision to discharge the first jury. Double jeopardy did not bar his second trial.

## B. Sufficiency of the Evidence

Warren argues that the government's case was too weak to support the jury's finding of guilt beyond a

reasonable doubt. The denial of Warren's Rule 29 motion for judgment of acquittal is reviewed de novo. *United States v. Bolivar*, 532 F.3d 599, 603 (7th Cir. 2008), *cert. denied*, 129 S. Ct. 962 (2009). In challenging the sufficiency of the evidence, Warren bears a heavy, indeed, nearly insurmountable, burden. *See Moore*, 572 F.3d at 337. A defendant challenging the sufficiency of the evidence "must convince us that even 'after viewing the evidence in the light most favorable to the prosecution, no rational trier of fact could have found him guilty beyond a reasonable doubt.'" *Id.* (quoting *United States v. Woods*, 556 F.3d 616, 621 (7th Cir. 2009)). Such a challenge leads to a reversal "'only if the record is devoid of evidence from which a reasonable jury could find guilt beyond a reasonable doubt.'" *Id.* (quoting *United States v. Farris*, 532 F.3d 615, 618 (7th Cir. 2008)).

Warren asserts that the evidence was insufficient to support a guilty finding because no evidence established that he ever visited the Tower Bank, no eyewitness identified him as one of the robbers, and no physical evidence linked him to the robbery. As we stated in *Moore*, however, "[a] verdict may be rational even if it relies solely on circumstantial evidence." *Id.* Though the evidence against Warren was circumstantial, it was more than sufficient to support his bank robbery conviction. We highlight some of the most damaging evidence against him: The GPS device led the police to 4217 Darby Drive within ten minutes of the bank robbery; the area was flooded with officers; and no one was seen coming from or going into the house until the homeowner arrived. Inside the house, officers found three

African-American men who fit the description of the robbers given by eyewitnesses. Warren was one of them. But Kenyatta didn't know Warren, and Warren had no permission to be there. The officers also found other evidence in the house that was traced to the bank robbery including cash, bait money, a gun, and clothes like those worn by the robbers. Gloves like the ones worn by the robbers were found in the car parked in the garage. Warren's DNA was found on one of them. On top of that, $20 of bait money was found on Warren's person.

Warren argues that he was convicted solely because he is African-American and socialized with a bank robber or robbers. He asserts that a more rational view of the evidence is that one of the three bank robbers had left the Darby Drive house, taking a third of the loot with him. This argument, like that made by Moore, is implausible. *See Moore*, 572 F.3d at 339. When would the third robber have escaped from the Darby Drive house, undetected by police? Warren would have had to have been in the house when the police arrived; he offers no explanation for how he could have snuck into the house, undetected, after it was surrounded by police. Nor does he offer any explanation whatsoever for his presence in the house. And Warren fit a description of one of the robbers. Unfortunately, he offered no evidence at trial to support the alternate view of the evidence he posits, except that about one-third of the stolen money was never recovered. Sorting the facts and inferences is a task for the jury. That the jury concluded Warren was involved in the robbery is not

irrational. The circumstantial evidence in this case supports a finding of guilty beyond a reasonable doubt.

### III.  Conclusion

The district court's judgment is AFFIRMED.