In the

# United States Court of Appeals

## For the Seventh Circuit

No. 09-2498

UNITED STATES OF AMERICA,

*Plaintiff-Appellee*,

*v.*

BRIAN BERG,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 07 CR 856—**Elaine E. Bucklo**, *Judge.*

ARGUED DECEMBER 8, 2009—DECIDED APRIL 5, 2011

Before EASTERBROOK, *Chief Judge*, and ROVNER and TINDER, *Circuit Judges.*

TINDER, *Circuit Judge.* Brian Berg was convicted of attempting to persuade, induce, or entice a minor to engage in sexual activity, 18 U.S.C. § 2422(b); knowingly receiving computer images of child pornography, 18 U.S.C. § 2252A(a)(2); knowingly distributing computer images of child pornography, § 2252A(a)(2); and knowingly possessing a computer disk containing images of

child pornography, § 2252A(a)(5). The district court sentenced Berg to 124 months for the § 2422(b) offense and 120 months for the other offenses, to run concurrently. Berg appeals, challenging the sufficiency of the evidence to sustain his § 2422(b) conviction. He also contends that prosecutorial misconduct during closing argument entitles him to a new trial on all of the charges against him. Finally, Berg argues that the district court failed to address his claim that the mandatory minimum sentence for § 2422(b) offenses results in unwarranted sentencing disparities, rendering his sentence unreasonable. We affirm.

## I.  Background

On May 30, 2007, Berg contacted an individual identifying herself as "Carrie," in an Internet chat room. Berg asked Carrie her age and location. She said she was sixteen and just moved to Palos Park, Illinois. Berg, who was twenty-eight years old, told Carrie that he was twenty-five years old and from Palos Heights, Illinois. Carrie told Berg to send a picture, and Berg sent her a photograph of himself. Carrie also told Berg that she smoked cigarettes.

"Carrie" was really Detective Dan Albrecht of the Western Springs Police Department, who was conducting an undercover operation targeting persons who used the Internet to solicit minors for sex. Detective Albrecht had created an online persona for Carrie, including an America Online (AOL) profile and MySpace page. The AOL profile identified Carrie as a sixteen-year-old girl

and included a photograph of what appeared to be a young teenager at a park. (The photo was really of a police officer.) Carrie's Myspace page also stated that Carrie was sixteen years old and included four photographs of the same officer posing as a young teenager. Detective Albrecht used the AOL user name "carrie4u1991."

Berg contacted Carrie again the next day. He asked her for a picture; she sent him one of the photos of the police officer posing as a young teen. Berg responded, "Nice." Berg asked Carrie why she liked "older guys" and told her that younger girls kissed better and that he "like[d] to touch when I kiss." Berg asked Carrie her bra size and whether she "use[d] lots of tongue" when she kissed. He told her that he thought girls looked sexy when they smoked and that he loved to watch sexy girls blow smoke out of their mouths. Berg offered to bring Carrie a pack of cigarettes if she would smoke for him and suggested that they meet. When Carrie asked Berg what they would do if they met, he suggested that they could "make out." He reiterated that he thought it looks sexy when a girl smokes. He then asked Carrie how far she had gone with a guy, and Carrie answered that she had had sex. Berg again suggested that they meet. When Carrie asked him what was in it for her, he answered, "free cigarettes," and asked what else she wanted. Berg suggested a third time that they meet.

On September 3, 2007, Berg contacted Carrie in the chat room and asked her if she liked older guys. Carrie told Berg that she was sixteen years old. Berg sent Carrie a

picture of his erect penis covered by boxer shorts and inquired whether she liked what she saw. He also asked her if she had any "sexy pics." She said no. Berg then asked Carrie "what kind of panties" she was wearing. She answered, "wouldn't you like to know," to which Berg responded, "we could meet up and you could show me LOL." Three times Berg suggested that Carrie meet him. He also asked her what she would want to do if they met. Berg then turned the conversation to oral sex. He told Carrie that he loved giving oral sex to a girl. He asked her what she liked to do sexually and whether she liked to receive oral sex. Carrie answered, "yes," and Berg said that he'd make her "go crazy" and expected "a good blow job" in return. When Carrie expressed concern over her ability to give him what he wanted, Berg assured her that she was "very sweet and fun to talk to" and that she "would be fine xoxoxo." He also described his prior sexual exploits with two other girls he had met online.

In the next few days, Berg contacted Carrie several more times in the chat room and sent her text messages. On September 4, he asked her what kind of panties she was wearing and told her that they should meet. She advised him she had plans with her girlfriends. Berg told Carrie to tell her friends she was busy. Carrie responded, "you would really have to entice me to make me blow them off," and Berg replied, "pretty much remember all the stuff we talked about yesterday." He told Carrie that if she gave him a chance to perform oral sex on her, she would want to come over every day. He assured her that it would be fun. Berg asked

Carrie about the color bra and kind of panties she was wearing. On September 5, Berg made arrangements to meet Carrie behind a liquor store at 55th Street and Willow Springs Road later that day. On his way to the meeting place, Berg had a telephone conversation with someone representing herself as Carrie (she was a female police officer). He said he thought it sounded like a man impersonating a girl. Berg claimed he thought he was being set up to get robbed. As a result, he didn't show up for the meeting.

Berg contacted Carrie several other times in the fall of 2007. For example, on October 13, he asked Carrie what kind of panties she was wearing. And on November 3, he contacted her and asked her if she had any new pictures, whether she had been with any guys lately, and what she was wearing. Berg told Carrie he would "like to meet up" and reminded her that he had said he "would love to lick your pussy last time." He suggested that "maybe [they] could meet up." Then he asked her if she gave "good blow jobs," what she liked to do to guys, and what she liked to have done to her. When Carrie responded that she loved back rubs, Berg assured her that he gave good back rubs.

On November 11, Berg again contacted Carrie. He asked her what she was wearing and what color bra she was wearing. He told her that he wanted to see it and asked her if she could go out. Berg sent Carrie another photograph of his erect penis covered by boxer shorts and again asked her if she could go out. Carrie agreed to meet him near the liquor store at 55th Street and Willow Springs Road. She suggested that they meet in

back; Berg countered that they meet out front. Carrie informed Berg that she had to be home by 9:00 p.m. that night.

Berg drove to meet Carrie at the designated meeting place, which was approximately eight to ten miles from his residence, sending her text messages along the way. He indicated that he'd be there at 8:13 p.m. Berg drove toward 55th Street and Willow Springs Road and past the liquor store a couple of times, under the observation of Detective Albrecht and other law enforcement officers. Then Berg pulled into the parking lot in front of the liquor store and was arrested immediately.

The officers took Berg to the Western Springs Police Department, where Detective Albrecht read Berg his *Miranda* rights. Berg signed a written *Miranda* waiver and agreed to speak with the detective. During his interview, Detective Albrecht asked Berg how old he thought Carrie was, and Berg said fifteen or sixteen years old. The detective asked Berg what he planned to do with Carrie had she shown up at the meeting place and specifically asked whether he would have had sex with her. Berg stated that he would not have had sex but would have had oral sex with her and a mutual showing of genitalia, as well as drive around. Detective Albrecht questioned Berg about his other Internet activities. Berg said that he had in-person meetings with ten to fifteen women and girls whom he first met on the Internet; five or six of them were under the age of seventeen. Berg also said that five months before his arrest he had met a minor under seventeen whom he had met

on Myspace, a social networking website. He said they drove around, and she gave him a "hand job" in his car, meaning that she rubbed his penis with her hand.

After Detective Albrecht interviewed Berg, Araceli Reyes Delacruz, an assistant state's attorney (ASA), arrived at the police station to interview Berg and take a statement from him. She first met with Detective Albrecht and reviewed the transcripts of the chats that he, posing as Carrie, had with Berg. After that, ASA Delacruz gave Berg his *Miranda* warnings, Berg waived his rights, and Delacruz interviewed him. At the end of the interview, Berg agreed to have ASA Delacruz write out a statement for him. The statement provides in part:

> Brian states that he has been chatting with "carrie4u1991" since May of 2007. Brian states that "carrie4u1991" stated that she was 16 years old and he told her that he was 25 years old. Since May 2007 until today's date Brian states that he has chatted with her several times. Brian states that People's Exhibit No. 1 is a copy of a chat he had with "carrie4u1991" on 9/4/07. Brian states that this is one of many chats he had with "carrie4u1991." Brian states that during this particular chat, he told "carrie4u1991" that he wanted to go down on her. Brian states that he meant he wanted to perform oral sex on her. . . .

> Brian states that People's Exhibit No. 2 is a copy of a chat he had with "carrie4u1991" on 11/3/07. Brian states that he again indicated that he wanted to perform oral sex on "carrie4u1991" . . . .

Brian states that on today's date, 11/11/07, he chatted with "carrie4u1991," emailed her, and text messaged her. Brian states that he and "carrie4u1991" agreed to meet at 55th and Willow Springs Road at Countryside, Illinois, at about 8:15. Brian states that he arrived at the agreed location to meet "carrie4u1991" and had she actually shown up he would have engaged in oral sex with her if she wanted.

After Berg's arrest, Detective Albrecht searched one of Berg's cell phones and found approximately thirty-three images of a younger female. Some of the images showed her clothed, some showed her naked and exposed her breasts and genitalia, and others showed her smoking. Berg told Detective Albrecht that the pictures were of his girlfriend, Kati, who was seventeen years old and lived in Oregon. Detective Albrecht found the name Kati in Berg's phone's contact list and placed a call to the number listed. A female answered, identifying herself as Kati, and said that Berg was her boyfriend.

An eight-count indictment charged Berg with one count of attempting to persuade, induce, and entice a minor under age eighteen to engage in sexual activity in violation of 18 U.S.C. § 2422(b) and several counts of knowingly receiving and distributing child pornography and possessing material containing child pornography in violation of 18 U.S.C. § 2252A(a)(2) and (5). Berg's case went to trial.

At Berg's trial, Kati testified that she met Berg in late spring or early summer 2003 when she was thirteen. (She

was born in early 1990.) Berg was twenty-three at that time. Kati's friend, Ashley, had told Kati about Berg and said that he gave her free cigarettes. Kati contacted Berg and asked him to get her cigarettes too. He agreed. When he gave the cigarettes to Kati, he asked her for the underwear she was wearing. Kati led Berg to believe that she was fifteen years old at that time. They saw each other every four or five days. Kati first had sexual contact with Berg anywhere from six months to a year after they first met. When she was fourteen years old, Kati and Berg engaged in oral sex, and they did so on more than one occasion. When she was fifteen, they had sexual intercourse in his car after Berg picked her up from an Alcoholics Anonymous meeting. And when she was sixteen, Berg first got her drunk and then they had sexual intercourse in his condo. Berg gave Kati approximately two to three hundred dollars that day. Kati estimated that he gave her a total of approximately $7,000 over the course of their relationship.

Around the time Kati was turning sixteen in early 2006, Berg sent her a text message telling her some of the sexual things she could do for him when she turned eighteen. Kati understood that Berg thought she was about to turn eighteen—not sixteen. She texted him that she was sorry she led him to believe that she was older than she really was and told him that she was actually turning sixteen years old. Kati testified that Berg was upset at first but then said that he was fine and she shouldn't worry about it. Berg continued to have sexual contact with Kati after that.

Kati moved to Oregon in August 2006. Berg paid for her to return to Illinois. Kati made five trips back to Illinois. On one such trip, Berg gave her alcohol, got her drunk, and they had sexual intercourse. When Kati was sixteen, Berg repeatedly asked her to send him pictures of herself, telling her what kind he wanted, including sexually explicit pictures. Kati sent Berg numerous pictures taken with her cell phone; some were sexually explicit. She also emailed him sexually explicit photos on January 10 and June 24, 2007. Kati was sixteen years old in January 2007 and seventeen years old in June that year. Berg saved the emails and the accompanying child pornography to his computer. Later that year, he distributed several of the sexually explicit pictures of Kati over the Internet.

Berg testified that based on Carrie's picture, she didn't look sixteen years old, and he thought she was eighteen or nineteen. He claimed that he got into conversations about oral sex with Carrie because she wanted him to. Berg testified that his intention in meeting Carrie on November 11 was to see who he had been communicating with. He said that he intended to spend ten minutes with her, "just to see who she [was]" and drive around. Berg denied that he would have engaged in oral sex with Carrie if she had shown up. Although he admitted to meeting in person "probably five" minors whom he first met on the Internet, he claimed that nothing sexual ever happened at the first and second meetings he had with the girls.

Berg testified about his interview at the police station with Detective Albrecht. He said that the detective

told him that if he cooperated, it would be a lot easier on him, and if he didn't cooperate, the detective could "screw you." Berg said that he believed it was in his best interest to cooperate. He also said that Detective Albrecht told him that the interview was being recorded and that a camera was in the interview room. Berg stated that Detective Albrecht asked him how old he thought Carrie was, and Berg answered that he was not sure. Then, according to Berg, the detective offered, "She said she was 16," and so Berg "just said, 'Okay, 16.'" Berg said that Detective Albrecht questioned him about what he would have done had he met Carrie, and he responded that "nothing would have happened; we would have just dr[i]ve[n] around." He claimed that Detective Albrecht then asked him, "Would you have had oral sex with her?" and he said, "No." Berg also claimed that the detective said, "Come on. You mean you wouldn't have oral sex if she wanted?" He again said, "No." According to Berg, the detective asked the same question again, saying, "Come on. You really wouldn't have oral sex with her if she offered?" He repeated, "No." Berg testified that the detective asked the same question a fourth time and he "finally agreed with him, because he kept saying, 'If you cooperate with me, this will be a lot easier.'" Berg also explained that Detective Albrecht had told him the interview was being recorded, so Berg thought the recording would show him denying that he would have had oral sex with Carrie three times and Detective Albrecht pressuring him into saying what Albrecht wanted him to say.

Berg stated that the ASA took a written statement from him, basically asking the same questions that the detective had put to him. Berg claimed that he denied he would have engaged in oral sex with Carrie, but Detective Albrecht was present and "wouldn't take [no] for an answer," so he "said yes, knowing I was being video-taped and they said this was being videotaped." The ASA asked Berg if he had been threatened, and according to Berg, he told her "no" because he "was going along with Albrecht" who was "telling [him] to cooperate." Berg agreed that he was allowed to make changes to his written statement before signing it and did in fact make a few changes. He said that he did not change his answer about having oral sex with Carrie, explaining that he "tried to say no already, and they wouldn't let me. [Detective Albrecht] wouldn't take no for an answer, so why try to change it. . . . [S]o I just agreed with him."

Detective Albrecht gave a different account of his interview of Berg. He described Berg as a little nervous, but calm and very cooperative. Detective Albrecht said he asked Berg how old he thought Carrie was, and Berg answered, "fifteen or sixteen." Detective Albrecht testified that he asked Berg what he planned to do with Carrie had she shown up and specifically asked if he would have had "sex" with her. Detective Albrecht testified that Berg said he would not have had sex (presumably meaning sexual intercourse) but would have had oral sex with her and a mutual showing of genitalia, and would have driven around.

In closing argument, Berg's counsel argued that the government did not prove beyond a reasonable doubt that Berg intended to engage in sexual activity with a minor when he traveled to meet Carrie on November 11. In rebuttal, the prosecutor responded that Berg wanted to have oral sex with Carrie. The prosecutor argued that Berg's intent was demonstrated by the chats themselves as well as by his admission at the police station and written statement. About that statement, the prosecutor argued:

> And what was it about? Do you really think for a moment— and I don't know if they really do or not, but whether or not when assistant state's attorney Delacruz, a respected assistant state's attorney, put up her hand and swore to tell the truth, that somehow she put into a written statement that the defendant signed that wasn't true? Why would she do that? Why in God's name would she willingly put her name to something that she wasn't, knew not to be true or wasn't accurate? It wouldn't happen. She put her job at risk, she put her livelihood at risk.

Berg's counsel objected. The district court did not rule on the objection or instruct the jury to disregard the statements, but simply told the prosecutor to move on. The jury found Berg guilty on all counts. Berg moved for judgment of acquittal or in the alternative for a new trial. The district court denied his motion and sentenced him to 124 months' imprisonment—a mandatory ten-year minimum plus four months (which the court added based on its finding that Berg had not been completely

truthful)—on the § 2422(b) offense and a 120-month concurrent sentence on the other seven counts.

## II. Discussion

### A. Sufficiency of the Evidence of a § 2422(b) Attempt

We begin with Berg's challenge to the sufficiency of the evidence to sustain his conviction under the "attempt" branch of § 2422(b), which provides in pertinent part:

> Whoever, using . . . any facility or means of interstate or foreign commerce . . . knowingly persuades, induces, entices, or coerces any individual who has not attained the age of 18 years, to engage in . . . any sexual activity for which any person can be charged with a criminal offense, or attempts to do so, shall be [punished accordingly].

We view the evidence in the light most favorable to the government and consider whether any rational trier of fact could have found the defendant guilty beyond a reasonable doubt. *United States v. Warren*, 593 F.3d 540, 546 (7th Cir. 2010). Berg faces a nearly insurmountable burden in challenging the sufficiency of the evidence. *United States v. Hensley*, 574 F.3d 384, 390 (7th Cir. 2009), *cert. denied*, 130 S. Ct. 1284 (2010).

To sustain an attempt conviction, the government "was required to prove that [Berg] acted with the specific intent to commit the underlying crime and that he took a substantial step towards completion of the

offense." *United States v. Coté*, 504 F.3d 682, 687 (7th Cir. 2007) (citations omitted); *see also United States v. Gladish*, 536 F.3d 646, 648 (7th Cir. 2008) ("To be guilty of an attempt you must intend the completed crime and take a 'substantial step' toward its completion." (citing *Braxton v. United States*, 500 U.S. 344, 349 (1991))). Berg's challenge to the sufficiency of the evidence against him is a narrow one. He does not dispute that a face-to-face meeting in the course of a grooming process can be sufficient proof of a "substantial step" toward the completion of a § 2422(b) attempt. He argues instead that his conviction cannot be sustained because the government failed to prove beyond a reasonable doubt that he had the specific intent to engage in sexual activity with Carrie on November 11, the evening of their planned meeting.

Berg's claim fails because there was plenty of evidence upon which the jury could have determined that he went to that meeting with sexual activity in mind. But as we will also discuss, Berg's premise that the planned meeting must include a sexual event is wrong.

The Internet discussions that preceded the planned meeting can be read as a whole to be dominated by sexual content. The chat transcripts are clear and provide substantial evidence of Berg's attempt to persuade, induce, or entice Carrie to participate in a variety of sexual acts and of his intent to do so. On numerous occasions, he asked her about her panties, her bras, and what she was wearing. He asked her if she could show him her underclothes. He repeatedly offered

her free cigarettes if she'd meet him—knowing that she smoked—and told her that girls looked sexy when they smoked. He asked her for "sexy pictures" and sent her two pictures of his "boxer shorts," even inquiring whether she liked what she saw. Their respective ages were clearly communicated during the discussions. Moreover, Berg engaged in even more explicitly sexual conversations with Carrie. Berg informed Carrie that he loved giving oral sex to a girl and asked her whether she liked to receive oral sex. When Carrie answered, "yes," Berg said that he'd make her "go crazy." He assured her that if he had the chance to perform oral sex on her, she would want him to do it every day. Berg let Carrie know that he expected "a good blow job" in return, and when Carrie expressed uncertainty about that, he reassured her that she "would be fine." On three separate occasions, Berg discussed his desire to have oral sex with Carrie, even encouraging her to "give [him] the chance to do it" and promising that if she did, she would want to "come over everyday." He asked Carrie to meet him numerous (more than sixteen) times and bragged about his sexual exploits with other girls he had met on the Internet. It is hard to read those chats as having any other purpose than intending to set up sexual encounters.

Berg suggests that his stated desire to have oral sex with Carrie in their Internet communications is insufficient evidence of his intent. He asserts that explicit sexual communications of this nature are not illegal, citing *Gladish* and *Hensley*. Neither case holds that explicit sexual communications over the Internet

are insufficient evidence of intent. *Gladish* focused on whether the government had proven that the defendant took a "substantial step" toward the commission of the completed offense. The evidence failed to establish that the defendant was more than "hot air": his chats with "Abagail" were sexually explicit, but he never indicated that he would travel to meet her to perform sex acts on her; nor did he invite her to meet him. And there was no suggestion that he ever had sex with an underage girl. *Gladish*, 536 F.3d at 648-50. Here, in contrast, Berg not only engaged in sexually explicit chats with Carrie, but also made arrangements to and traveled to meet her, actually on two occasions, September 5 and November 11. In addition, the jury heard from Kati that Berg had engaged in sexual activity with her when she was under seventeen. In *Hensley*, we considered evidence of the defendant's numerous online and phone conversations with an online person named "Jen" about meeting for sex as evidence of his intent. 574 F.3d at 390. *Hensley* is of no help to Berg on the issue of his intent.

While Berg argues that his past pattern of conduct shows that nothing sexual would have happened the first night he met Carrie, the jury could have found otherwise. It is true that Kati testified that she had her first sexual contact with Berg six months to a year after they met. However, other than Berg's self-serving testimony that nothing ever happened at any of his other first or second in-person meetings, that is the only evidence of Berg's "pattern of conduct." A jury reasonably could have rejected Berg's testimony about this supposed

pattern of conduct and found that Kati's experience was insufficient to establish a pattern of conduct negating any intent. Furthermore, what actually happened or didn't happen between Berg and Kati, and Berg and the other five minors, may have little bearing on Berg's intent at those prior first meetings. It is one thing to intend to do something, here specifically, to intend to persuade, induce, or entice a minor to engage in sexual activity. It is another thing to actually succeed. That it may have taken Berg several in-person meetings to persuade the other girls to engage in sexual activity does not necessarily mean that he had no intent to engage in such activity at an initial meeting and would have done so had they agreed. Moreover, rather than viewing the evidence of Berg's activities with Kati as cutting against a finding of his intent, the jury could have found Kati's testimony to be strong evidence of Berg's intent to engage in sexual activity with Carrie.

In addition, the jury had the evidence that Berg admitted first to Detective Albrecht and then to ASA Delacruz that he would have had oral sex with Carrie had she shown up at their meeting place. That testimony was accompanied by Berg's signed, written statement which was admitted into evidence. The statement provides in part: "Brian states that he arrived at the agreed location to meet 'carrie4u1991' and had she actually shown up, he would have engaged in oral sex with her if she wanted." The statement concludes: "Brian states that everything contained in this statement is true and correct," which is followed by Berg's signature and those of ASA Delacruz, Detective Phillip LoChirco,

and Detective Albrecht, who were present when Berg gave his written statement.

Berg makes much of his testimony that when interviewed by Detective Albrecht, he initially denied that anything sexual would have happened and that the detective had to ask him the same question four times before he agreed that he would have had oral sex with Carrie. Berg claimed that he thought the interview was being recorded and that the recording would show him three times denying that he would have had oral sex with Carrie and Detective Albrecht pressuring him into saying what he wanted to hear. The trial court charged the jury with deciding whether Berg made the statements to law enforcement and the ASA, and if so, to decide what weight to give the statements. The court instructed the jury that "[i]n making this decision, you should consider all matters in evidence, including . . . the circumstances under which the statements were made." Berg points to the fact that during the sentencing hearing, the district court found it plausible that Berg did not immediately admit to wanting to have oral sex with Carrie. That may be a reasonable view of the evidence. But it is not the only one. The jury did not have to credit any of Berg's testimony about the interview. More to the point, the jury did not have to believe his testimony that he made this admission just because Detective Albrecht wouldn't take no for an answer and not because it was, in fact, the truth.

Berg counters the evidence of his intent with several other arguments. He points out that none of the chats,

and especially the communications arranging the rendez-vous, specifically include an agreement to have sexual relations at a time certain. He points out that in one of the last chats, Carrie asked him what they would do when they met, and he responded that he didn't know and that they would drive around, without specific mention of sexual activity. But the chats did not have to specify an agreement to have sexual relations; the jury could reasonably find from the overall tenor of the many chats and Berg's persistence in meeting with Carrie that Berg intended for some sexual activity to occur. Indeed, in requesting that they meet and discussing what they would do when they met, Berg suggested that they "just hang out and talk, . . . go from there" and "see what happens." The jury could reasonably find from the evidence that although Berg told Carrie in a later chat that they would just drive around, his intent was that they have oral sex. *See Hensley*, 574 F.3d at 391 (concluding that defendant's conversations revealed that he had "sex on his mind and was interested in much more than a platonic relationship"). The jury could reject Berg's testimony that his intent in meeting Carrie that night was merely to see who she was and spend several minutes with her, just driving around. The jury did not have to believe Berg when he said he had no intent to engage in oral sex with Carrie when he met her.

Berg also points out that the agreement was to meet for only about twenty minutes. But the type of activities that he discussed with Carrie in the chats would not necessarily take a long period of time, at least not to constitute a violation of the Illinois law. *See* 720 ILCS

5/12-15(c) (criminal sexual abuse is committed if an accused "commits an act of sexual penetration or sexual conduct with a victim who was at least 13 years of age but under 17 years of age and the accused was less than 5 years older than the victim"); *People v. Poe*, 896 N.E.2d 453, 458 (Ill. Ct. App. 2008) (defining "sexual conduct" to include "any intentional annoying touching or fondling by the accused either directly or through the clothing of any part of the body of the child under 13 years of age for the purpose of sexual gratification or arousal"). Berg also points out that he was not carrying any condoms or sexual paraphernalia when he was intercepted at the meeting site. But again, sexual activity of the type he described would not require such things. And he ignores the fact that he had two cases of beer in his car as he drove to the anticipated November 11 meeting as well as how helpful alcohol had been in his prior grooming of Kati as a victim.

Berg also maintains that his prior encounters with underage victims did not result in sexual activity during the first and second meetings, which he asserts shows that several months would pass after his initial meeting with Carrie before any sexual activity would take place. It is true that the district judge mentioned in post-verdict hearings that her assessment of the evidence allowed her to accept Berg's assertion that he did not intend to engage in sexual activity with Carrie at the November meeting. (Although the judge clearly believed that Berg intended to engage in sexual activity with Carrie while she was underage.) But the district judge's view of the evidence does not control what a reasonable

jury could find. There was plenty of evidence intro-
duced at trial for the jury to conclude that Berg went to the
November 11 meeting with a sexual purpose in mind.
The jury did not have to find that he intended to act in
a manner consistent with his past. The jury could have
found that Berg's claimed pattern of conduct was "beside
the point" because he confessed to the detective and
ASA that he intended to have oral sex with Carrie if she
showed up and wanted it. The evidence before the jury
allowed it to conclude that Berg intended to act on what-
ever opportunities were available to him during the
planned meeting.

In a related argument, Berg asserts that intent to
engage in sexual activity "on some date in the future"
cannot sustain his conviction under § 2422(b). This is
because Carrie indicated she was born in 1991, seventeen
is the age of consent in Illinois, and the evidence
regarding Kati shows that one year elapsed before any
sexual activity took place. Thus, Berg submits, Carrie
arguably could reach the age of consent before any
sexual activity occurred. She did not disclose her date
of birth during the chats, instead only indicating that
she was sixteen years of age. So, the argument goes, she
could have reached the age of consent by January 1, 2008.
The district court concluded that Berg could have met
Carrie on November 11 without an intent to engage
in sexual activity that night, yet still be convicted of a
§ 2422(b) attempt because he intended to engage in
sexual activity with her during her minority. As
addressed above, there was abundant evidence to
prove beyond a reasonable doubt that Berg intended to

engage in sexual activity with Carrie, someone he believed was under seventeen years of age. And Berg hasn't argued that he lacked such intent. Instead, he focuses on his claimed intent specifically on November 11. In his reply brief, Berg goes so far as to assert that the indictment charged that the § 2422(b) attempt offense "was to take place on November 11, 2007." That is an incomplete reading of the indictment. The indictment charged that Berg "[f]rom on or about May 30, 2007 and continuing to on or about November 11, 2007, . . . using a facility and means of interstate and foreign commerce, did knowingly attempt to persuade, induce, and entice 'Carrie4u1991,' whom [he] believed to be a female minor . . . to engage in sexual activity for which [he] could be charged with a criminal offense." Thus the indictment did not limit the offense to having occurred on November 11. Nor did it charge that the intended sexual activity was to occur on that date.

As the district court instructed the jury, the government had to prove that Berg "knowingly took a substantial step toward the commission of the offense *with* the intent to commit that offense." *See, e.g.*, *Gladish*, 536 F.3d at 648 (emphasis added). Berg does not challenge the sufficiency of the evidence to establish that he knowingly took a substantial step toward the completion of a § 2422(b) attempt. While mere sexually explicit talk may not suffice to establish a "substantial step," "making arrangements for meeting the girl, as by agreeing on a time and place for the meeting" surely does. *Gladish*, 536 F.3d at 649. Berg first errs in focusing solely on the events of November 11. He ignores the

evidence, some of which came from his own testimony, that he made arrangements to meet Carrie behind a liquor store at 55th Street and Willow Springs Road on September 5. They didn't end up actually meeting that evening because, Berg testified, on his way to the meeting place, he had a phone conversation with a person he believed was Carrie, and the voice on the phone sounded like a man impersonating a girl; so he hung up, turned around, and went home. He claimed he thought he was being set up to be robbed. The jury could have found that this arrangement to meet on September 5 was a substantial step. Based on the chat evidence, the jury could have found that Berg made this arrangement with the intent to engage in sexual activity with Carrie.

The evidence of the events of November 11 could also support a finding that Berg took a substantial step with the requisite intent. Berg again made arrangements to meet Carrie and even traveled to the meeting place. As stated, the jury was not obliged to conclude that his claimed "past pattern of conduct" limited how far he intended to take things on November 11. More to the point, the jury did not have to credit his denial of an intent to engage in sexual activity with Carrie on November 11. The chat evidence and Berg's confession weighed against finding his denial credible. Nothing he communicated in those chats suggested that he intended to defer his sexual ambitions with Carrie until a certain date or until she reached a certain age. In fact, those chats could be understood as reflecting Berg's intent to take advantage of whatever sexual opportunity Carrie might present as soon as they might meet. Thus, a reasonable

jury could find from the evidence that Berg took a substantial step or steps toward the completion of the § 2422(b) offense. A reasonable jury also could find from the evidence that Berg took that step or steps with the intent to engage in sexual activity with Carrie.

Yet another way to look at this is that Berg misunderstands the "underlying" and "completed" crime to which *Coté* and *Gladish* refer to be the criminal sexual activity itself. However, "the underlying crime" means "one of the proscribed acts with respect to a minor," *Coté*, 504 F.3d at 687, that is, to persuade, induce, entice, or coerce, *id.*; *accord United States v. Murrell*, 368 F.3d 1283, 1286 (11th Cir. 2004). Because Berg was charged with a § 2422(b) attempt, the government's burden was to prove beyond a reasonable doubt that he intended to persuade, induce, or entice someone whom he believed was a minor to engage in sexual activity—not that he intended to engage in sexual activity. *Coté*, 504 F.3d at 687 (stating that "the Government's burden in [a § 2422(b) attempt] case is to demonstrate, beyond a reasonable doubt, that the defendant *intended* . . . to induce, entice or coerce a minor").[1]

Language in *Hensley* and *Gladish* may seem to suggest that a defendant must intend to engage in sexual activity with the minor. The defendant in *Hensley* was convicted of attempt under § 2422(b). On appeal, he argued that the evidence was insufficient to show that he took a

---

[1] Section § 2422(b) also includes the verb "coerce," but the indictment did not charge Berg with attempting to coerce.

"substantial step" toward the completion of the § 2422(b) offense. We concluded that evidence that the defendant "groomed" the minor "Jen" for sex, arranged a meeting place and time to meet her, and actually traveled to the meeting place before being deterred by law enforcement's presence was more than sufficient for the jury to find a "substantial step." *Hensley*, 574 F.3d at 391. The defendant argued that his travel to the meeting place should be viewed in the context of his last phone call to "Jen" before he went to meet her in which "he told her he was not sure sex was a good idea and asked if it was alright if they just hung out together." *Id.* We concluded that a jury could have found that Hensley wanted sex—not just to hang out. *Id.* But the case did not call upon us to decide what specific intent was required for a § 2422(b) attempt conviction.

In *Gladish*, after holding that the government had not proven that the defendant took a substantial step toward the completion of the § 2422(b) attempt crime, we addressed the exclusion of an expert witness's testimony, saying that "[t]he psychologist could not have been permitted to testify that the defendant did not intend to have sex with 'Abagail,' but he could have testified that it was unlikely, given the defendant's psychology, that he would act on his intent." *Gladish*, 536 F.3d at 650. The reason such testimony was relevant: the likelihood that a defendant would act on an expressed intent to have sex with someone may be probative of whether or not he intended to persuade, induce, or entice that person to engage in sex with him. We did not decide

in *Gladish* what intent is necessary—whether it is the intent to persuade, induce or entice; or the intent to engage in sexual activity—to convict a defendant of a § 2422(b) attempt crime.

Moreover, we noted in *United States v. Cochran*, 534 F.3d 631 (7th Cir. 2008), that "other courts have emphasized that § 2422(b) criminalizes 'the persuasion, inducement, enticement, or coercion of the minor rather than the sex act itself.'" *Id.* at 634 (quoting *Murrell*, 368 F.3d at 1286 and citing *United States v. Bailey*, 228 F.3d 637, 639 (6th Cir. 2000)); *see also United Sates v. Lee*, 603 F.3d 904, 914 (11th Cir. 2010) ("Section 2422(b) expressly proscribes the persuasion, inducement, enticement, or coercion of a minor to engage in illicit sexual activity, and not the sexual activity itself." (quotation omitted)); *United States v. Goetzke*, 494 F.3d 1231, 1236 (9th Cir. 2007) (explaining that a § 2422(b) attempt requires proof of an attempt to persuade, induce, entice or coerce rather than proof of an attempt to engage in sexual activity). Ergo, "if a person *persuaded* a minor to engage in sexual conduct (e.g., with himself or a third party), without then actually committing any sex act himself, he would nevertheless violate § 2422(b)." *Murrell*, 368 F.3d at 1286 (emphasis in original). The key here is that Berg was charged with knowingly attempting to *persuade*, *induce*, and *entice* Carrie, whom he believed to be under age seventeen, to engage in sexual activity—not with attempting to *engage* in sexual activity with her. *See Goetzke*, 494 F.3d at 1236; *see also Lee*, 603 F.3d at 916 (stating that § "2422(b) does not require proof of an attempt at child molestation").

*Bailey* addressed the argument pressed here: whether a § 2422(b) attempt conviction requires the specific intent to commit an illegal sexual act rather than the mere intent to persuade or solicit the minor to commit a sexual act. 228 F.3d at 638. The court found the argument meritless:

> While it may be rare for there to be a separation between the intent to persuade and the follow-up intent to perform the act after persuasion, they are two clearly separate and different intents and the Congress has made a clear choice to criminalize persuasion and the attempt to persuade, not the performance of the sexual acts themselves. Hence, a conviction under the statute only requires a finding that the defendant had an intent to persuade or to attempt to persuade.

*Id.* at 639. The other circuits to have addressed the issue of what intent is required under § 2422(b) are in accord. *Lee*, 603 F.3d at 914 (a conviction for attempted enticement under § 2422(b) requires proof "that the defendant intended to cause assent on the part of the minor, not that he acted with the specific intent to engage in sexual activity" (quotation omitted)); *United States v. Dwinells*, 508 F.3d 63, 71 (1st Cir. 2007) (holding § 2422(b) does not require an intent that the criminal sexual activity be consummated); *United States v. Brand*, 467 F.3d 179, 202 (2d Cir. 2006) ("A conviction under § 2422(b) requires a finding only of an attempt to entice or an intent to entice, and not an intent to perform the sexual act following the persuasion."); *United States v.*

*Thomas*, 410 F.3d 1235, 1244 (10th Cir. 2005) ("Section 2422(b) requires only that the defendant intend to entice a minor, not that the defendant intend to commit the underlying sexual act."); *United States v. Patten*, 397 F.3d 1100, 1103 (8th Cir. 2005) ("[T]he intent that violates § 2422(b) is the intent to persuade a minor to engage in illegal sexual activity"); *see also* Andriy Pazuniak, *A Better Way to Stop Online Predators: Encouraging a More Appealing Approach to § 2422(b)*, 40 Seton Hall L. Rev. 691, 704 (2010) (Section "2422(b) does not require a defendant to demonstrate an intent to actually engage in illegal sexual activity with a minor. Rather, a defendant violates § 2422(b) by merely attempting to persuade a minor to engage in illegal sexual activity."). Thus, § 2422(b) "criminalizes an intentional attempt to achieve a *mental* state—a minor's assent—regardless of the accused's intentions vis-à-vis the actual consummation of sexual activities with the minor." *Dwinells*, 508 F.3d at 71; *accord Goetzke*, 494 F.3d at 1236 (explaining that an attempt to violate § 2422(b) "is an attempt to achieve the mental act of assent"). Simply put, the statute targets the sexual grooming of minors as well as the actual sexual exploitation of them. The statute's focus is on the intended effect on the minor rather than the defendant's intent to engage in sexual activity.

Evidence that Berg intended (or did not intend) to engage in sexual activity with Carrie on November 11 may have been probative of his intent to persuade, induce, or entice her to engage in sexual activity. *Cf. Goetzke*, 494 F.3d at 1236 (stating that physical proximity can be probative of an attempt to persuade a minor to

engage in sexual activity). Nonetheless, the government was not required to prove such an intent in order to sustain his conviction for an attempt under § 2422(b). The government presented substantial evidence from which a rational jury could find beyond a reasonable doubt that Berg intended to persuade, induce, or entice someone whom he believed was a minor to engage in illegal sexual activity. Therefore Berg's challenge to the sufficiency of the evidence on the § 2422(b) offense fails.

### B. The Prosecutor's Remarks

The next issue is whether alleged improper remarks in the prosecutor's rebuttal argument denied Berg a fair trial. We employ a two-part test to evaluate claims of prosecutorial misconduct in closing arguments. *United States v. McMath*, 559 F.3d 657, 667 (7th Cir.), *cert. denied*, 130 S. Ct. 373 (2009). We first consider the remarks in isolation to determine whether they were improper, and if so, then we consider the remarks "in the context of the entire record and assess whether they [h]ad the effect of denying the defendant a fair trial." *Id.* (quotation omitted). On appeal, the government admits that its brief rebuttal remarks about the professional risk ASA Delacruz might incur from perjury were improper. Based on that concession, we can move directly to the second part of the test.

> In assessing the effect of improper remarks, we consider: the nature and seriousness of the state-ment; whether the statement was invited by the con-duct of defense counsel; whether the district court sufficiently instructed the jury to disregard such

statements; whether the defense could counter the improper statement through rebuttal; and finally, whether the weight of the evidence was against the defendant.

*McMath*, 559 F.3d at 667 (quoting *United States v. Severson*, 3 F.3d 1005, 1014 (7th Cir. 1993)). Improper remarks during closing argument "rarely rise to the level of reversible error . . . ." *Id.* (quoting *United States v. Wilson*, 985 F.2d 348, 353 (7th Cir. 1993)). While the remarks may have been improper, they did not have the effect of denying Berg a fair trial.

It is true that the remarks were not invited by defense counsel, the district court did not instruct the jury to disregard the improper remarks, and defense counsel had no chance to counter the remarks since they were made in rebuttal argument. Furthermore, the prosecutor implied that facts not in evidence arguably enhanced ASA Delacruz's credibility. The government claims that the ASA's credibility was never at issue. Although her credibility may not have been a key issue, a witness's credibility is almost always at issue. And the prosecutor's remarks themselves suggest that the government thought her credibility was at issue.

Yet ASA Delacruz's testimony about Berg's written statement was not necessary to the jury's determination of guilt. As previously discussed, the Internet chats and Berg's efforts to meet face-to-face with Carrie presented a mountain of evidence of his guilt. Then Berg signed the written statement. The jury heard evidence that he was allowed to make changes before signing it. The jury

was entitled to find that Berg would not have signed the statement if it were untrue. Detective Albrecht also testified that even before signing the written statement, Berg said he would not have had sex (in the sense of sexual intercourse) with Carrie, but would have had oral sex with her and a mutual showing of genitalia. Even under Berg's version of the interview, he told the police and the ASA that he would have had oral sex with Carrie. Berg's failure to admit immediately that he would have engaged in oral sex with Carrie does not detract from the fact that he made this admission. The trial court charged the jury with deciding whether Berg made the statements to law enforcement and an ASA, and if so, to decide what weight to give the statements. The court instructed the jury to "consider all matters in evidence, including . . . the circumstances under which the statements were made." As noted, the jury did not have to credit Berg's self-serving explanation for why he said he would have had oral sex with Carrie had she shown up. Finally, though Berg's intent *to engage in sexual activity with Carrie* on November 11 may be probative of his intent *to persuade, induce, and entice her* to engage in sexual activity, it was his intent to do the latter—not the former—that the government had to prove to sustain a conviction. And there was overwhelming evidence of Berg's intent to persuade, induce, and entice Carrie to engage in sexual activity.

The prosecutor's remarks about ASA Delacruz's credibility, even if improper, do not bear the significance that Berg places on them. We are assured that those remarks did not have the effect of denying Berg a fair trial.

### C. Claim of Unwarranted Sentencing Disparities

Finally, Berg contends that the district court failed to address his claim that the mandatory minimum sentence for a § 2422(b) conviction results in unwarranted sentencing disparities, contrary to 18 U.S.C. § 3553(a)(6). This alleged error, according to Berg, rendered his sentence unreasonable. We review sentencing procedures de novo, *United States v. Panice*, 598 F.3d 426, 431 (7th Cir. 2010), and review the sentence itself for reasonableness, *United States v. Poetz*, 582 F.3d 835, 837 (7th Cir. 2009). A below-Guidelines sentence, like Berg's, is presumptively reasonable. *Id.*[2]

The record shows that the district court addressed Berg's claim of unwarranted sentencing disparities. At the sentencing hearing the court said that it "share[d] counsel's concern about disparity here" and stated that courts are to avoid unwarranted sentence disparity. According to the district court, accomplishing that in Berg's case was "very difficult . . . because [the sentences] are all over the place." The court identified ten cases and the sentences imposed, noting the conduct for which the defendant was convicted and other relevant information, including the differences in the number of images involved and the defendant's background, among

---

[2] Berg's opening brief asserts that we exercise plenary review over his claim that his sentencing proceeding failed to comport with due process, but he fails to develop any such argument. Therefore it is waived. *United States v. Useni*, 516 F.3d 634, 658 (7th Cir. 2008).

other factors. The court said that it mentioned some of the cases "because . . . even a minimum statutory sentence . . . here is years longer than some of the sentences in these cases where I think the conduct . . . is much worse." Berg's Guideline range was 235 to 293 months. The court sentenced Berg to 124 months, only four months above the mandatory minimum, see 18 U.S.C. § 2422(b), and way below the Guidelines range. "[S]entencing courts are . . . bound by the minimum sentences set forth in the United States Code," *United States v. Harris*, 567 F.3d 846, 852 (7th Cir.) (citing *Kimbrough v. United States*, [552 U.S. 85, 107,] 128 S. Ct. 558, 573 (2007), *cert. denied sub nom. James v. United States*, 130 S. Ct. 1032 (2009), so the court was obliged to sentence Berg to at least 120 months. And the court explained that the four months above the minimum sentence were to account for its finding that Berg had not been completely truthful at trial. Thus, in imposing the 124-month, below-Guideline sentence, the court did what it could to account for unwarranted sentencing disparities, while not dipping below the mandatory minimum. Nothing more was required to satisfy the obligation to consider § 3553(a)(6). Berg has not rebutted the presumption of reasonableness that attaches to his below-Guidelines sentence.

### III. Conclusion

For the foregoing reasons, we AFFIRM the district court's judgment.